## IN THE UNITED STATES OF AMERICA

ON ATLANTA GEORGIA THE GOVERNMENT CHARGES
FIVE PEOPLE AND CO—DEFENDANTS FROM GRAND
JURY. AND CONTINUES TO JURY TRIAL. 90—95.

ORESTE BRUZON: PRO-SE PLAINTIFF.

**RECEIVED**

OCT 2 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

V:

DRUG ENFORCEMENT ADMINISTRATION.
  DEFENDANT

CIVIL ACTION N: 07—01393(EGS)

## MOTION FOR SUMMARY JUDGMENT

THIS IS RESPONDED TO CIVIL ACTION DATE ON 10-3-2007. ABOUT TO
RESPECTFULLY SUBMITTED, TO COURT AND ASSISTANT UNITED STATES.
TO CIVIL ACTION.

THE PLAINTIFF, ORESTE BRUZON: A.K.A. SANTO AND PRO—SE: THE
PLAINTIFF, SUBMMITS ONE "AFFIDAVIT" AND OTHER DOCUMENTS TO
SUPPORT THE EVIDENCE. IN THE CASE AND PERSON FEDERAL AGENTS AND
ASSISTANT ATTORNEY IN THIS CASE THE ATLANTA GEORGIA.

ORESTE BRUZUN: A.K.A.SANTO
NUMBER 43855-019

FEDERAL CORRECTIONAL COMPLEX LOW B-4
P.O.BOX. 1031 COLEMAN FLORIDA 33521-1031.

"SWORN AFFIDAVIT"

I, ORESTE BRUZON, DO SWEAR UNDER THE PENALTY OF PERJURY AND
PURSUANT TO TITLE 28 U.S.C. &1746 THAT THE DOCUMENTS ATTACHED
HERETO CONTAINING, THE BEST OF MY KNOWLEDGES AND ARE TRUE AND
CORRECT...DONE THIS    OF ==========================================

"VERY TRULY YOURS"

TO:..EMMET G. SULLIVAN                    TO:..OLIVER W.MCDANIEL,
UNITED STATES DISTRICT COURT              ASSISTANT UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA              555 4TH STREET N.W.
U.S. COURTHOUSE                           WASHINGTON DC 20530
333CONSTITUTION AVENUE, N.W.
WASHINGTON,DC 20001

ORESTE BRUZON: *Orost Bruzon* EXECUTED DAY 10/22/07    x

## IN THIS CASE THE DEFENDANT ARGUMENTS

### "THE DEFENDANT ASK TO HONORABLE COURT BASED ON LAW AND JUSTICE"

I "ONLY" NEED IS ONE REPORT OF INVESTIGATION ABOUT THE GOVERNMENT PRESENTED TO EVIDENCE TO JURY TRIAL. REPORT INVESTIGATION "EXHIBIT 6, THE GOVERNMENT CATALOGED COUNT #3 9-29-94. THE GOVERNEMT SAID I SOLD TO C.I. DANNY CAMACARO. I ARGUMENTS THIS EXHIBIT 6 "DO NOT EXIST"BECAUSE I DO NOT MAKE THIS TRANSACTION 9-29-94.

> I,M ASK TO HONORABLE COURT "ONLY" I NEED
> IS DO NOT EXIST THAT EXHIBIT 6, 9-29-94
> I NEED TO AN LEGAL PAPER "DO NOT EXIST.

### DECLARATION OF WILLIAM C. LITTLE JR. AND OLIVER W. MCDANIEL, PROOF THE EXHIBIT 6, AND ONE-HALF KILO. DO NOT IS ME NAME.

48. PAGE 13: SAID: SARO, CONDUCTED A NADDIS QUERY ON SEPTEMBER 8, 2006, AND DID NOT LOCATE ANY DOCUMENTS MEETING THE CRITERIA SET OUT IN THE **PLAINTIFF** REQUEST FROM **DEA** INVESTIGATION FILE **GS-94-0100** OF A DEA 7, REPORT OF DRUG PROPERTY COLLECTED, PURCHASED, ON SEIZED, AND A DEA FROM 6 REPORT OF INVESTIGATION, DATED SEPTEMBER,29, 1994

### "THIS IS PROVE DO NOT EXIST EXHIBIT 6.

50. **PAGE 13: SAID:** THE PAGES OBTAINED FROM **DEA ATLANTA GEORGIA** OFFICE WERE SOBSEQUENTLY PROCESSED BY **SARO.** THE INFORMATION ON THE PAGES **"DOES NOT CORRESPOND TO THE PLAINTIFF"** RESQUEST FOR INFORMATION REGARDING GOVERNMENT **"EXHIBIT 6"** THAT RELATED TO A SEIZURE OF APPROXIMATELY ONE-HALF KILO OF OCCRRED ON SEPTEMBER 29. 1994. THE THREE-PAGES **ROI** AND A DRUG SEIZURE REPORT DOCUMENT AND AN EVENT, SURVEILLANCE SEIRE; THE SEIZURE INVOLVED A THIRD-PARTY AND A CODE CONFIDENTIAL SOURCE THAT **"DID NOT INVOLVE THE PLAINTIFF;"** OCCURRED ON A DATE PRIOR TO THAT DESCRIBED BY THE **"PLAINTIFF;"** AND THE QUANTITY OF COCAINE WAS **"DIFFERENT"** FROM THAT STATED BY THE **"PLAINTIFF".**

> NOTE: TO HONORABLE COURT: LOOK THIS INFORMATION. THE
> OR DECLARATION MR. OF WILLIAM C. LITTLE, JR.
> ABOUT THE EXHIBIT 6 AND THE AMONGST THE DRUG
> "DID NOT IS PART THE ORESTE BRUZON.

CONTINUES TO DECLARATION OF WILLIAM C. LITTLE, JR. AND PROVING THE ASSISTANT ATTORNEY FROM ATLANTA GEORGIA PRESENTED TO GRAND JURY AND TO JURY TRIAL ELEMENTS THE CRIME "DID NOT IS PART THE ORESTE BRUZON. LOOK MR. LITTLE,JR. SAID THE TRUTH"

52. **PAGE** 14 **SAID:** NOTWITHSTANDING THE FACT THAT **DEA** DRUG **"EXHIBIT 6"** AND THE ASSOCIATED **ROI** CONTAINED IN **DEA** INVESTIGATIVE CASE FILE NO.G3-0100 **"DOES NOT CORRESPOND WITH THE DESCRIPTION OF THE RECORD"** CONTAINED IN HIS REQUEST, THE REPORTS CONTAINED IN **IRFS** RELATE TO A THIRD-PARTY AND IF RELEASED, COULD DISCLOSE THE IDENTITY A CODED CONFIDENTIAL SOURCE.

<u>**NOTE: TO HONORABLE COURT THIS IS THE TRUTH**</u>

CONTINUED PAGE  25: **SARO** CONDUCTED A NADDIS QUERY ON SEPTEMBER 8, 2006, AND DID NOT LOCATE **ANY** DOCUMENTS MEETING THE CRITERIA SET OUT IN THE **"PLAINTIFF"** RESQUEST FROM**DEA** INVESTIGATIVE FILE **GS-94-0100** OF A **DEA** 7, REPORT OF DRUG PROPERTY COLLECTED, PURCHASED, OR SEIZED, AND A **DEA** FROM 6, REPORT OF INVESTIGATION, DATE SEPTEMBER 29, 1994. LITTELE **DECL., 48.**

NOTE: TO HONORABLE COURT LOOK DECLARATION
<u>MR. WILLIAM C. JR. DID NOT EXIST.</u>

**CONTINUED PAGE 25: SAID:** AFTER FAILING TO LOCATE THE RECORD DESCRIBED BY **PLAINTIFF** A **DEA** DRUG **"EXHIBIT 6"** USING **NADDIS, SARO** CONTACTED THE **DEA "ATLANTA GEORGIA"** OFFICE AND REQUESTED THAT THE CASE AGENT CONDUCT A SEARCH FOR THE SPECIFICITY DOCUMENTS. LITTE **DECL., 49.** TWO (2) DOCUMENTS TOTALING FOUR (4) PAGES AND CONSISTING OF A **DEA** FORM 7, DATED **"SEPTEMBER 14, 1994"** DOCUMENTING THE SEIZURE OF 165.9 GRAMS OF COCAINE AND A **ROI** DATED SEPTEMBER 15, 1994, DESCRIBING A SURVEILLANCE REPORT AND THE AQUISITION OF THREE (3) DRUG EXHIBITS THAT IN CLUDED **DEA** DRUG **"EXHIBIT 6,** WERE FORWARDED TO **SARO** BY SENSE AGENT. **ID** THE PAGES ODTAINED FROM THE **"ATLANTA GEORGIA"** OFFICE OF **DEA** WERE SUBSEQUENTLY PROCESSED BY **SARO.** LITTLE DECL., 50. HOWEVER, THE INFORMATION IN THE DOCUMENTS **"DID NOT CORRESPOND"** TO **"PLAINTIFF"** REQUESTS FOR INFORMATION REGARDING GOVERNMENT **"EXHIBIT 6,** THAT IS RELATED TO A SEIZURE OF APPROXIMATELY ONE-HALF KILO GRAM OF COCAINE THAT OCCURRED ON SEPTEMBER 29, 1994, **ID.** THE THREE-PAGES **ROI** AND A DRUG SEIZURE REPORT DOCUMENT AN EVENT, SURVEILLANCE AND SEIZURE; THE SEIZURE INVOLVED A THIRD-PARTY AND A  CODE CONFIDENTIAL SOURCE AND **"DID NOT INVOLVE THE PLAINTIFF".** CONTINUES PAGE 26. THE SEZURE OCCURRED ON A DATE PRIOR TO DESCRIBED BY THE **"PLAINTIFF"** AND THE **"QUANTITY OF COCAINE WAS DIFFERENT** FROM THAT STATES BY THE **PLAINTIFF. ID.** ACCORDINGLY, THE PAGES **"NOT RESPONSIVE TO THE PLAINTIFF"** REQUESTS.LITTLE DECL., 51.

NOTE: TO HONORABLE COURT: THE PLAINTIFF, ORESTE
BRUZON, A.K.A. SANTO: MR. WILLIAM C. LITTLE, SAID
DECLARATION SAID THE TRUTH. BECAUSE I DO NOT SOLD
THE ONE-HALF KILO TO I.C. CAMACARO. AND TNE AGENTS
<u>AND ASSISTANT ATTORNEY PRESENTED EXHIBIT 6.</u>

## ON PAGE 26 1. DEA PROPERLY RELIED ON PA EXEMPTION (J)(2)

**PAGE 26:** **SAID:** NOTWITHSTANDING THE FACT THAT **DEA** DRUG "**EXHIBIT 6,** AND THE ASSOCIATED **ROI** CONTAINED IN **DEA** INVESTIGATIVE CASE FILE NO. G3-0100 "**DID NOT CORRESPOND"** TO THE DESCRIPTION OF THE RECORDS IN HIS REQUEST, THE REPORT FOUND THROUGH SEARCHING **IRFS** RELATE TO A THIRD-PARTY, AND IF RELEASED, COULD DISCLOSE THE IDENTITY OF A CODE CONFIDENTIAL SOURCE. LITTLE DECL., 52.

> NOTE: TO HONORABLE COURT: ABOUT THIS DECLARATION THE
> WILLIAM  C. LITTLE, JR. PROVE BASED ON LAW, THE
> PLAINTIFF ORESTE BRUZON. DO NOT DUE THIS TRANSACTION
> THE GOVERNMENT CATALOGED ONE-HALF KILO TO 9-29-1994.
> AND THE EXHIBIT 6 DID NOT EXIST.
> ==============================================

> THIS IS THE EVIDENCE SUPPORT ONE MORE TIME TO PROVE THE TRUTH
> AND CONTRAPTION THE AGENTS AND ASSISTANT ATTORNEY LARRY-
> ANDERSON...IN JURY TRIAL? LOOK?
> ==============================================

IN ATLANTA, FULTON COUNTY, GEORGIA, WEDNESDAY, OCTOBER

23, 1996, 8:45 A.M., IN OPEN COURT. IN JURY TRIAL?

**IN JURY TRIAL: RAUL MORALES AND LARRY ANDERSON"**

RAUL MORALES. I AM A FORENSIC CHEMIST FOR DRUG ENFORCEMENT.
IN MIAMI FLORIDA.

**PROSECUTOR AND MORALES:** ON PAGE 440, LINE 9 TO 25, PROSECUTOR, TO MR. MORALES: MR. MORALES, I M GOING TO SHOW YOU SEVERAL **EXHIBITS** AT ONE TIME. ONE IS MARKED GOVERNMENT "**EXHIBIT #6,**" LINES 21 PROSECUTOR. GOVERNMENT **EXHIBIT IS 6,13-A,15, AND 15-A.** WILL ASK YOU TO START 6. TAKE A LOOK AT IT IF WILL FOR A MOMENT. WITH RESPECT TO GOVERNMENT "**EXHIBIT #6,**" CAN YOU TELL ME WHETHER OR NOT THAT PACKAGE, GOVERNMENT "**EXHIBIT #6",** IS FAMILIAR TO YOU? ON PAGE 441 LINES 18 TO 19, MORALES SAID,I DID THE ANALYSIS OF THIS PARTICULAR **EXHIBIT ON 10-17-1994.**

ON PAGE 443 LINES 5 TO 7, PROSECUTOR TO MORALES ARE THE CONTENTS OF THOSE TWO PACKAGES FAMILIAR TO YOU? MORALES SAID YES, THE SAME WAY. PROSECUTOR,SAME WAY AS "**EXHIBIT #6?** MORALES YEAS. SAME PAGE LINES 22 TO 25, PROSECUTOR, AND WAS IT THE SAME TEST THAT YOU DESCRIBED EARLIER FOR "**EXHIBIT #6?** MORALES YES, THAT CORRECT, THE SAME TYPE OF TESTS.

**MR. RAUL MORALES:** IN JURY TRIAL SAID: ON PAGE #445 LINES 2 TO 3. ONE MORE I FOUND COCAINE, WITH A STRENGTH OF 80 PERCENT, AND THE "**NET WEIGHT, JUST THE WHITE SUBSTANCE, 83.6GRAMS."** "**MR. MORALES HI SAY"** ABOUT THE EXHIBIT 6 THE 83.6 GRAMS. **BUT** WHO IS AMOUNT THE GOVERNMENT CHARGED FOR HALF KILO 9-29-94. **BUT** MORALES SAID HI WEIGHT 83.6 GRAMS.
> MR. MORALES IS FORENSIC CHEMIST
> FOR DRUG MIAMI. BUT HI LIE.
> ================================

## CROSS- EXAMINATION

**BY MR. JONE: ATTORNEY:**

MR. JONE ATTORNEY THE ORESTE BRUZON: ON PAGE #445 LINES 18 TO 25, JONES: MORALES, I M DAVE JONES. JUST ONE OR TWO QUESTIONS FOR YOU, SIR. **WAS IT EXHIBIT #6** THAT YOU IDENTIFIED AS CONTAINING THE ROUGHLY 490 GRAMS OF COCAINE? AM I CORRECT ABOUT THAT? MORALES THE BIGGEST NUMBERS, YES, **"EXHIBIT #6.** ATTORNEY. AND ALL THIS IS **"EXHIBIT #6.** THERE NO 6-A? MORALES NOT IN THIS CASE NO. IN THIS CASE AGENTS NO A REQUEST MADE FOR **"FINGERPRINT ANALYSIS".**

IN JURY TRIAL THE PROSECUTOR AND AGENTS ACCUSED TO ORESTE BRUZON SOLD ONE-HALF OF DRUG FROM **"A SHED" LOCATED RIGHT NEXT TO THE GARAGE"** OF BRUZON HOSE AND IN JURY TRIAL PROSECUTOR CLASSIFIED **"EXHIBIT #6" THE GOVERNMENT.**

**THIS IS THE TESTIMONY I.C. CAMACARO:** DANNY CAMACARO IS WITNESS OF THE GOVERNMENT AND HIS TESTIMONY SAID THAT ON 9-29-1994. ORESTE BRUZON, TOOK OUT KILO DRUG FROM A SHED LOCATED RIGHT NEXT TO THIS GARAGE. THE HOUSE. AND SOLD ONE-HALF KILO. THIS HALF KILO THE AGENTS AND PROSECUTOR CATALOGED **"EXHIBIT #6. SEE PAGES #145-147-329 AND 641.**

### TESTIMONY THE "AGENT PEREZ" TO THE COUNT #3:

**THE AGENT PEREZ.** ON PAGES # 672-674 AND 675,TESTIFIER HE SAYS WAS SPOKEN BY AN AGENT THAT HE HAD PARTICIPATED AND KNEW THE **HOUSE THE ORESTE BRUZON,** AND THE WAS OBTAINED DATE 9-29-94, **"AS EXHIBIT #6"** THE **"AGENT PEREZ SAY"** THAT AT ORESTE BRUZON **"HOUSE"** THERE IS **"DOE NOT SHED LOCATED RIGHT NEXT TO THE GARAGE," OUTSIDE OF THE HOUSE".** LOOK THE TESTIMONY THE AGENT PEREZ DO NOT SHED TO GARAGE THIS IS THE TRUTH. THIS TESTIMONY IS **DO NOT EXIST EXHIBIT #6 AND DO NOT EXIST HALF KILO AND I,M PROVING THE TRUTH."**

IN THIS CASE THE GOVERNMENT CHARGES IN THE INDICTMENT FROM GRAND JURY. AND CONTINUED TO JURY.FIVE PEOPLE. THREE GOT TO JURY TRIAL.IN THE CHARGES THE INDICTMENT ORESTE BRUZON. A.K.A. SANTO. COUNTS 3 AND 4. **WITH ONE ANOTHER.**BETWEEN THE THREE ONLY. BASED ON LAW THE GOVERNMENT TRIED WITH ONE ANOTHER BETWEEN THE THREE CHARGES IN THE INDICTMENT. ONLY. DO NOT ANOTHER PEOPLE OR ANOTHER CRIME. **BUT THE GOVERNMENT PRESENTED** OTHER PEOPLE IS DANNY CAMACARO. HI DID NOT BELONG THIS CASE OR BELONG THIS CRIME.

**THIS IS PROSECUTOR AND DANNY CAMACARO**
**ABOUT THE COUNT #3 9-29-1994. IN JURY**
**HALF KILO. PAGES #143-LINES 23 TO 25.**
**144-145-146-147 AND 148.**

<u>THIS IS FINAL ARGUMENTS</u>

### AND OTHER EVIDENCE TO PROVEN ANOTHER VIOLATION TO LAW BASED ON JUSTICE.

THE GOVERNMENT CHARGES COUNT #4 APRIL 7, 1995. BETWEEN THE JESUS BRUZON AND ORESTE BRUZON. IN THE INDICTMENT. AND ON JURY TRIAL THE GOVERNMENT CHARGED. THE TWO BRUZON, SOLD THREE OUNCES TO "DANNY CAMACARO" **ON APRIL 7, 1995.**

<u>ATTORNEY FOR ORESTE BRUZON AND DANNY CAMACARO:</u>

**ATTORNEY DEFENDANT: AND C.I. CAMACARO:**

ON PAGE 235, AND CONTINUING PAGE 236, THE ATTORNEY: ASKED CAMACARO: ON ALL THE TAPED RECORDINGS PRESENTED HERE TO THE COURT, WAS ORESTE BRUZON VOICE PRESENT OR HEARD ANY OF THEM? **CAMACARO:** SAY, **"NO".** ON PAGE 236 LINES 3 TO 7, THE ATTORNEY: ASKED CAMACARO: LET ME MORE **"SPECIFI,DID THE TRANSACTION OF APRIL 7, 1995,"** WHICH WAS ON TAPE LABELED TE-7, INVOLVE ONLY AND JESUS BRUZON **CAMACARO:** ANSWERED, YES. ON PAGE 236 LINES 20 TO 25, THE ATTORNEY: ASKED **CAMACARO:** IF ORESTE BRUZON WAS EVER PRESENT WHEN THE CONVERSATION BETWEEN JESUS BRUZON LOOK PLACE: **CAMACARO:** ANSWERED, **"NO",** ON PAGE 237, THE **CAMACARO: CONFIRMS THIS AGAIN.**

**THIS IS TO PROVE:** THE C.I. DANNY CAMACARO: IS THE INSTRUMENT THAT THE AGENTS USED TO INVOLVE ORESTE BRUZON IN COUNT #4 AND 3 HE KNEW AND THAT ORESTE BRUZON WAS NOT INVOLVED ON SUCH DAY ON COUNTS #3 AND 4 THE C.I. CAMACARO. AND TESTIMONY ON JURY TRIAL PROVE THAT THE AGENTS FABRICATED ALL THOSE COUNTS 3 AND 4.

### <u>THE INVESTIGATION AND SPECIAL AGENT STEARNS JURY TRIAL</u>

<u>ATTORNEY DEFENDANT AND AGENT JIM STEARNS:JURY TRIAL</u>

ON PAGE 598, LINES 12 TO 15, THE **ATTORNEY:** SAYS TO AGENT STEARNS, LET ME ASK YOU, DID THIS TRANSACTION **"ONLY"** INVOLVE OR TAKE PLACE BETWEEN THE C.I.CAMACARO: AND JESUS BRUZON? AGENT STEARNS REPLIES THAT CORRECT:ON PAGE 599, LINES 10 TO 25,AND CONTINUES ON PAGE 600, THE **ATTORNEY:** SAID TO STEARNS IT IS REFLECTED THAT A TAPED RECORDING WAS PRODUCED IN REGARDS TO SAID TRANSACTION WHICH OCCURRED BETWEEN THE C.I.CAMACARO: AND JESUS BRUZON.WAS ORESTE BRUZON INCLUDED IN THAT RECORDED CONVERSATION? AGENT: ANSWERE **"NO".**THAT CONVERSATION OCCURRED BETWEEN DANNY CAMACARO AND JESUS BRUZON. **SEE THE TRUTH:** ATTORNEY ASKED "WAS ORESTE BRUZON INVOLVED IN THE EVENTS TRANSPIRING ON SAID DATE?" **"SA STEARNS REPLIED, NO."**

THIS ARGUMENT TO COUNT FOUR IS TO EXAMPLE TO
PROVE THE AGENTS AND PROSECUTOR ELABORATED
THE COUNT FOUR BETWEEN TWO BRUZON. DO NOT EXIST.

THE GOVERNMENT ACCUSED THE ORESTE BRUZON AND JESUS BRUZON. **COUNT #4 APRIL 7 1995.** BOTH BEING ACCUSE OF VIOLATION THE ONE ANOTHER LAW. DURING JURY TRIAL. **I,M WAS PROVING THE COUNT FOUR** FROM APRIL 7, 1995 **"WAS ELABORATED INTENTIONALLY"** AGAINST ORESTE BRUZON, **"WHO HAD NOTHING DO ,"** IN THIS PARTICULAR, COUNT #4 THE APRIL 7, 1995. WA **"DISMISSED "** DURING THE JURY TRIAL IN REGARDS TO ORESTE BRUZON.

**PROSECUTOR AND C.I. CAMACARO:**

ON PAGE 156 LINES 5 TO 25, PROSECUTOR: NOW MR. CAMACARO, ON APRIL 7, 1995, DID YOU HAVE OCCASION TO MEET WITH **JESUS BRUZON** ON THAT DAY? CAMACARO: YES, SIR. PROSECUTOR: DID YOU HAVE OCCASION TO HAVE THAT CONVERSATION **RECORDED?** CAMACARO: YES SIR. PROSECUTOR: LET ME SHOW YOU WHAT WE HAVE MARKED AS GOVERNMENT #7 AND ASK YOU IF YOU CAN IDENTIFY THAT? **CAMACARO:** YES. PROSECUTOR:WHAT IS IT? CAMACARO: IT A RECORDING. PROSECUTOR : OF WHAT? **CAMACARO:** **"BETWEEN CHINO BRUZON AND ME.** PROSECUTOR: AND WHAT DAY **CAMACARO:** 4-7-95. SEE PAGES 156 AND 157.

NOTE:   BASED ON SA AGENT STEARNS DECLARATION IT IS CLEAR THAT THE AGENTS THE PROSECUTOR AND THE WITNESS OF THE GOVERNMENT PLANNED TO INVOLVE AND FIND A CONNECTION TO FROM A CONSPIRACY. **EXAMPLE:** IN THIS CASE IF YOU TAKE THE INDICTMENT AND THE GOVERNMENT ACCUSATION YOU CAN SEE THAT ALL CHARGES ARE **"INDIVIDUAL AND SEPARATED"** ALL THE DEFENDANTS ARE CHARGED WITH A COUNT A WITH CAMACARO BUT SEPARATELY. CONCLUION: IF THERE IS NO CONNECTION A SALE OR A RECORDING THAT INVOLVE TWO OR THREE PERSONS.

**EXAMPLE:** THE PROSECUTOR AND THE THREE AGENTS RESPONSIBLE FOR COUNT #4 OF APRIL 7. 1995. AGENTS STEARNS- PEREZ AND SINDALL. THESE THREE AGENTS RESPONSIBLE FOR SEEKING JUSTICE AS WELL AS THE PROSECUTOR ON PAGE 582, THE PROSECUTOR STARTS WITH AGENT STEARNS, **CURIOUSLY** NEITHER THE PROSECUTOR NOR THE AGENT MENTIONS COUNT #4 INVOLVING ORESTE BRUZON. THE ONLY MENTION JESUS BRUZON IN COUNT #4. ON PAGE 652, THE PROSECUTOR AND AGENT PEREZ TALKING AND ALLEGING ABOUT COUNT #4 INVOLVING JESUS BRUZON, BUT **CURIOUSLY** THEY DID NOT MENTION ORESTE BRUZON. ON PAGE 723, THE PROSECUTOR AND AGENT SINDALL, ALLEGE ABOUT COUNT #4 INVOLVING JESUS BRUZON, AGAIN THEY DID NOT MENTION ORESTE BRUZON AS BEING INVOLVED IN THIS COUNT.

## ARGUMENT FINAL BASED ON LAW UNITED STATES:

IN THE UNITE STATES OF CONSTITUTION THIS COUNTRY.AND BASED THE FIFTH AMENDMENT SAID ANY PERSON TO MAKE ONE CRIME IN VIOLATION LAW. THE GOVERNMENT SUPPOSE TRIED FROM JURY FOR THE CRIME MAKE OR VIOLATED THE LAW. **"BUT"** ALL CRIME THE GOVERNMENT ACCUSED OR TRIAL IS ON BASED ON THE **"INDICTMENT"** CHARGES **"DO NOT ANOTHER"** PERSON **"DO NOT IS PART THIS CRIME"** CHARGES THE **"INDICTMENT"**.

### IN THIS CASE THE ELEMENT THE CRIME IS BETWEEN THE THREE PEOPLE GOT TO JURY "WITH ONE ANOTHER" AND ELEMENT THE CRIME IS BETWEEN THE THREE.

FAILURE OF INDICTMENT TO ALLEGES ALL ESSENTIAL OF AN OFFENSE ..IS A JURISDICTIONAL DEFECT REQUIRING DISMISSAL.. DEPRIVATION OF THE DEFENDANTS SUBSTANTIAL RIGHT TO BE TRIED ONLY ON CHARGES PRESENTED IN AN INDICTMENT RETURNED BY A GRAND JURY .. IS FAR TOO SERIOUS TO BE TREATED AS MORE THAN A **VARIANCE** AND THEN DISMISSAL AS HARMLESS ERROR, **STIRONE, ALSO PRENTISS V. UNITED STATES** 206 F3D AT 976 APPLYING HARMLESS ERROR ANALYSIS TO THE TOTAL OMISSION OF AN ESSENTIAL ELEMENT WOULD ALLOW THE PROSECUTION TO CIRCUMVENT THE GRAND JURY PROCEEDING. **UNITED STATES V. SPRULL,** 118 F3D 221, 227 (4TH CIR. 1997) IT IS WELL ESTABLISHED THAT FAILURE TO RECITE AN ESSENTIAL **"ELEMENT"** OF THE OFFENSE IN THE INDICTMENT IS NOT AMENABLE TO HARMLESS ERROR **REVIEW"**

**U.S. V. CANCELLIERS,** 69 F3D 116 (11TH CIR. 1995). FUNDAMENTALS PRINCIPALS STEMMING FROM THE FIFTH AMENDMENT IS THAT DEFENDANTS CAN ONLY BE CONVICTED OF THE CRIME NAMED THE INDICTMENT. **SEE U.S. V. MOLINARO,** 11 F3D 853 (9TH CIR. 1993). **U.S. V. HOMICK,**965 F2D 899 (9TH CIR. 1992). **(1)**..THE FIFTH AMENDMENT REQUIRES THAT DEFENDANTS BE **"TRIED"** ONLY ON CHARGES HANDED DOWN BY A GRAND JURY AND THUS, AFTER INDICTMENT HAS BEEN RETURNED, ITS CHARGES MAY NOT BE BROCADED AMENDMENT EXCEPT BY GRAND JURY. **(2)..""VARIANCE"** RISES TO THE LEVEL OF REVERSIBLE ERROR WHERE EVIDENCE PRESENTED AT TRIAL TOGETHER WITH JURY INSTRUCTION, RISE THE POSSIBILITY THAT DEFENDANT WAS CONVICTED ON OFFENSE OTHER THAN THE CHARGES IN THE INDICTMENT.

ON THIS CASE THE GOVERNMENT CHARGES THE THREE PEOPLE ON THE INDICTMENT FOR ONE CRIME **"WITH ONE ANOTHER"** VIOLATION LAW IN UNITED STATES. **"BUT"** IN JURY TRIAL. THE GOVERNMENT VIOLATED LAW AND THE DEFENDANTS **"RIGHT"** TO TRIED FOR THE CRIME ONLY THE INDICTMENT. AND THE PEOPLE IN THE INDICTMENT ONLY. IN THIS CASE, THE GOVERNMENT CHARGES THE COUNTS 3 AND 4, BETWEEN THE THREE PEOPLE IN THE INDICTMENT. "BUT" THE GOVERNMENT USED VARIANCE THE PEOPLE AND THE CHARGES. WHO IS THE PEOPLE CHARGES IN THE INDICTMENT ONLY THREE **DO NOT ANOTHER PEOPLE.** WHO IS DANNY CAMACARO THIS PEOPLE **DO NOT IS PART THIS CRIME CHARGES OR THE INDICTMENT.**

IN THIS CASE DEFECT THE INDICTMENT IS CLERK AND ELEMENTS THE CRIME IS CLERK THE GOVERNMENT DUE FATAL ERROR. BECAUSE THE GOVERNMENT CHARGES IN THE INDICTMENT **"FOR TWO CRIME DO NOT EXIST"** IN THIS CASE OR IN THE INDICTMENT. NOTE: THE COUNTS 3 AND EXIST YES BUT, IS FABRICATED AND INTENTIONAL FOR AGENTS BECAUSE ORESTE BRUZON, **"DO NOT EXIST,** IN THE TRANSACTION. SECOND, THE COUNT #3 9-29-94 IN THIS ARGUMENT THE DEFENDANT PROVE IS THE COUNT FABRICATED AND **"DO NOT EXIST"** ALSO THE GOVERNMENT PRESENTED TO JURY TRIAL FALSE EVIDENCE AND **"VARIANCE" AND ALTER THE CRIME"**.

### CONTINUE TO PROVE THAT THE AGENTS INVOLVED
### THE TWO BRUZON INTENTIONALLY

### INVESTIGATION REPORT OF THE COUNT #4 THE APRIL 7, 1995.

ON MAY 9,1995, A REPORT WAS PREPARED BY THE AGENTS ABOUT THEIR PARTICIPATION IN

THE EVENTS OF APRIL 7,1995, THE AGENTS WERE: SINDALL, JACK HARVERY, JOSE DIAZ

AND MANUEL PEREZ. IT WAS THEIR FIRST REPORT OF THIS INVESTIGATION.THE DETAILS

OF APRIL 7, 1995, SAY THAT AT THEY AGENTS WERE IN THE NEIGHBORHOOD AROUND THE

EL CHARRO #1. THAT THEY OBTAINED THE CONVERSATION WITH JESUS BRUZON CHINO) AT

SEE ALL **REPORT INVESTIGATION TO PROVE THE ORESTE BRUZON DOE NOT IN COUNT #4. AND**

**THE AGENTS AND PROSECUTOR FABRICATED EVIDENCES TO INDICTMENT.**

### FINAL DECISION ABOUT THE TRUTH:

DANNY CAMACARO: IS ONLY A CRIMINAL ,A CRIMINAL BY THE GOVERNMENT AND ITS AGENTS.
**EXAMPLE:** ON PAGE 221, THE DEFENDANT ATTORNEY EXPOSED CAMACARO PAST. THE ATTORNEY
SHOWED THAT CAMACARO POLICE RECORD REFLECTED THAT HE HAD BEEN ARRESTED ON
FOURTEEN DIFFERENT OCCASION UNDER FOURTEEN DIFFERENT ALIASES. ON PAGE 220 AND
240, YOU CAN FIND WHAT TYPE OF CRMINAL DANNY CAMACARO TRULY IS. A CRIMINAL WHO,
IN THIS CASE, WAS FEATURED AS A STAR WITNESS BY THE AGENTS AND PROSECUTOR. THIS
MAN IS NOTHING BUT A THIEF, A DRUG DEALER, AND GENERALLY, A THUGH. HIS RAP SHEET
REFLECTS A CRIMINAL RECORD SO LONG THAT THERE IS NO ROOM HERE TO LIST HIS CRIME.
ON PAGE 233, THE ATTORNEY ASKED CAMACARO: IF THE GOVERNMENT HAD PAID HIM MORE
THAN 30,000. CAMACARO RESPONSE WAS AFFIRNATIVE. YES.

```
in this case the defendant alleges the government and agents federal
did not power or jurisdictions to accused the people for did not
reason to charges in the indictment. the federal agents also to
prosecutor the deprive the life the defendants for charges for one
crime did not exist also prosecuted for one crime did not exist and
fabricated. and pay the the people to testimony in jury to lies and
fabricated evidence. because the counts 3 and 4 was fabricated.
```

### THIS IS TO EXAMPLE TO HONORABLE COURT

THIS DECLARATION AND **"REPLY"** THE PART THE PLAINTIFF SUPPOSED IS CONTRADICT THE

DECLARATIONS THE ASSISTANTS ATTORNEY UNITED STATES, **TO OLIVER W. MCDANIEL,**. **BUT** ALL

DECLARATION THE MR. MCDANIEL, FOR ME IS OK HI SAID THE TRUTH AN THE DECLARATION.

## TABLE OF THE APPENDIX BY NUMBER

INDICTMENT  TO  1990  TO  1995:----------------------------------------------------#1


THIS PAGES TO APPENDIX IS THE
DECLARATION OF WILLIAM C. LITTLE
JR. AND OLIVER W. MCDANIEL.
PAGES   #13-14-25- AND 26:------------------------------------------------------#2

PROSECUTOR AND RAUL MORALES:
TO EXHIBIT 6: PAGES 440-441-
443 AND 445:--------------------------------------------------------------------#3

BY MR. JONES AND RAUL MORALES
PAGE #445:----------------------------------------------------------------------#4

PROSECUTOR AND DANNY CAMACARO:
PAGES #145-147-329 AND 641:----------------------------------------------------#5

TESTIMONY AGENT PEREZ:
PAGES  #672-674-AND  675:------------------------------------------------------#6

PROSECUTOR AND DANNY CAMACARO:
PAGES #144-145-146-147 AND 148:------------------------------------------------#7

ATTORNEY DEFENDANT AND DANNY CAMACARO:

PAGES 235-236 AND 237:--------------------------------------------------------#8

ATTORNEY AND AGENT JIN STEARNS:
PAGES #598-599 AND 600:-------------------------------------------------------#9

PROSECUTOR AND DANNY CAMACARO:
PAGES 156 AND 157:------------------------------------------------------------#10

EXAMPLE: CAMACARO:
PAGES  #582-  652-AND  723:---------------------------------------------------#11

EXAMPLE AND DANNY CAMACARO:
PAGES #221-220-240 AND 233:---------------------------------------------------#12


ALSO SEE REPORT INVESTIGATION
MAY 9, 1995. COUNT #4:----------------------------#13

**ORIG. INDICTMENT**                                                                    **#1**

IN THE UNITED STATES DISTRICT COURT

DEC 0 5 1995

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

LUTHER D. THOMAS, CLERK
By: _____ Deputy Clerk

UNITED STATES OF AMERICA         :         CRIMINAL INDICTMENT

v.                               :         NO. 1:95-CR-537

ORESTES BRUZON, a/k/a "Santos,"  :
JESUS E. BRUZON-GONZALEZ,        :
   a/k/a "Chino,"               :
DIOSDADO MARRERO-DUQUE,          :
   a/k/a "Lalo,"                :
JOSE LUIS ESCOBAR-TORRES,        :
   a/k/a "Pepito," and          :
ALFONSO GUADALUPE, a/k/a "Pito"  :

THE GRAND JURY CHARGES:

COUNT ONE

That from a date unknown to the Grand Jury, but at least by January 1, 1990, and continuing

until the date of this indictment, in the Northern District of Georgia and elsewhere, the defendants,

ORESTES BRUZON, a/k/a "Santos,"
JESUS E. BRUZON-GONZALEZ, a/k/a "Chino,"
DIOSDADO MARRERO-DUQUE, a/k/a "Lalo,"
JOSE LUIS ESCOBAR-TORRES, a/k/a "Pepito," and
ALFONSO GUADALUPE, a/k/a "Pito,"

and others both known and unknown to the Grand Jury, did combine, conspire, confederate, agree,

and have a tacit understanding among and with one another to commit offenses against the United

States of America, that is, violations of Title 21, United States Code, Section 841(a)(1), to wit: to

knowingly and intentionally possess with the intent to distribute a mixture containing cocaine

hydrochloride, a Schedule II narcotic controlled substance, in violation of Title 21, United States

Code, Section 846.

## COUNT TWO

That on or about August 26, 1994, in the Northern District of Georgia, the defendant,

JOSE LUIS ESCOBAR-TORRES, a/k/a "Pepito,"

did intentionally possess with the intent to distribute a quantity of cocaine a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT THREE

That on or about September 29, 1994, in the Northern District of Georgia, the defendant,

ORESTES BRUZON, a/k/a "Santos,"

did intentionally possess with the intent to distribute a quantity of cocaine a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT FOUR

That on or about April 7, 1995, in the Northern District of Georgia, the defendants,

ORESTES BRUZON, a/k/a "Santos," and
JESUS E. BRUZON-GONZALEZ, a/k/a "Chino,"

did intentionally possess with intent to distribute in Atlanta, Georgia, and elsewhere, a quantity of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

#1

## COUNT FIVE

That on or about June 28, 1995, in the Northern District of Georgia, the defendant,

ALFONSO GUADALUPE, a/k/a "Pito,"

did intentionally possess with intent to distribute in Atlanta, Georgia, and elsewhere, a quantity of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT SIX

That on or about July 12, 1995, in the Northern District of Georgia, the defendant,

JESUS E. BRUZON-GONZALEZ, a/k/a "Chino,"

did intentionally possess with intent to distribute in Atlanta, Georgia, and elsewhere, a quantity of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT SEVEN

That on or about October 11, 1995, in the Northern District of Georgia, the defendant,

ALFONSO GUADALUPE, a/k/a "Pito,"

did intentionally possess with intent to distribute in Atlanta, Georgia, and elsewhere, a quantity of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

#1

## FORFEITURE PROVISIONS

This indictment charges the defendants,

ORESTES BRUZON, a/k/a "Santos,"
JESUS E. BRUZON-GONZALEZ, a/k/a "Chino,"
DIOSDADO MARRERO-DUQUE, a/k/a "Lalo,"
JOSE LUIS ESCOBAR-TORRES, a/k/a "Pepito," and
ALFONSO GUADALUPE, a/k/a "Pito,"

with violations of Title 21, United States Code, Sections 841(a)(1) and 846. Pursuant to Title 21, United States Code, Section 853, upon conviction of either violation of the law, such convicted defendant shall forfeit to the United States (1) any property, real or personal, tangible or intangible, constituting or derived from proceeds obtained directly or indirectly as the result of such violations, and (2) any of his/her property used or intended to be used, in any manner or part, to commit or to facilitate the commission of such violations, including, but not limited to, the following property:

1) 3474 Havalyn Drive, Doraville, Georgia - described as follows:

    All that tract or parcel of land lying and being in Land Lot 296 of the 6th Land District of DeKalb County, Georgia, being Lot 6 Block T of Northwoods Subdivision, Unit Eight, as per plat thereof recorded in Plat Book 25 page 47 of the public records of DeKalb County, Georgia, which said plat is incorporated herein by reference and made a part thereof;

2) 4427 Malibu Drive, Decatur, Georgia - described as follows:

    All that tract or parcel of land lying and being in Land Lot 194 of the 15th District of Dekalb County, Georgia, being Lot 27, Block B, Heatherwood North Subdivision, according to plat which is recorded at Plat Book 38, Page 151, and revised at Plat Book 45, Page 130, Dekalb County Records; being improved property known as 4427 Malibu Drive, according to the present system of numbering houses in Dekalb County, Georgia, said plat by reference is incorporated herein and made a part thereof.

3)    1995 Nissan Altima, VIN 1N4BV31D9SC106342, Georgia License #XCZ-632;

4)    1986 Cadillac DeVille, VIN 1GGCD6980G4J05954, Georgia License #973CX, registered to Alfonso Guadalupe, 1946 Young Road, Lithonia, Georgia 30058;

5)    $1,000,000.00 in United States Currency, representing the proceeds from the sale of cocaine by or on behalf of the defendant, ORESTES BRUZON, a/k/a "Santos," during the calendar years 1990-1995;

6)    $1,000,000.00 in United States Currency, representing the proceeds from the sale of cocaine by or on behalf of the defendant, DIOSDADO MARRERO-DUQUE, a/k/a "Lalo," during the calendar years 1990-1995.

The types of property which may be forfeited to satisfy this claim include, but are not limited to, all of the foregoing properties, any property, real or personal, traceable to the foregoing properties, and any "substitute" property, as defined in Title 21, United States Code, Section 853(p). If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third person;

(c)    has been placed beyond the jurisdiction of this Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of said defendant of a

#1

value equal to any and all assets identified specifically in the Indictment as substitute assets pursuant to Title 21, United States Code, Section 853(p).

A _TRUE_____ BILL

_____
(FOREPERSON)

KENT B. ALEXANDER
UNITED STATES ATTORNEY

LAWRENCE O. ANDERSON
ASSISTANT UNITED STATES ATTORNEY
75 SPRING STREET, N.W., SUITE 400
ATLANTA, GEORGIA 30335
404-331-3784
GEORGIA BAR NO. 017660

December 5, 1995

ATTEST: A TRUE COPY
CERTIFIED THIS
DEC 06 1995
Luther D. Thomas, Clerk
By: Deputy Clerk

6

#2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ORESTE BRUZON,                          )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )
                                        ) Civil Action No. 07-1393 EGS
DRUG ENFORCEMENT ADMINISTRATION, )
                                        )
                    Defendant.          )
_____ )

## DECLARATION OF WILLIAM C. LITTLE, JR.

I, William C. Little, Jr., hereby make the following Declaration under penalty of perjury pursuant to 28 U.S.C. § 1746.

1. I am an Attorney admitted in and a member in good standing in the Bar of the State of Pennsylvania.

2. I am currently employed as a practicing attorney by the United States Department of Justice (DOJ), Drug Enforcement Administration (DEA), where I am assigned to the Office of Chief Counsel, Administrative Law Section.

3. Within the DEA Office of Chief Counsel, I am the attorney responsible for matters involving the Freedom of Information Act (FOIA), 5 U.S.C.§ 552, and the Privacy Act (PA), 5 U.S.C. § 552a, in which DEA is an interested party. I have served in this capacities since about April 26, 1999.

48. SARO conducted a NADDIS query on September 8, 2006, and did not locate any documents meeting the criteria set out in the plaintiff's request from DEA investigative file GS-94-0100 of a DEA 7, Report of Drug Property Collected, Purchased, or Seized, and a DEA Form 6, Report of Investigation, dated September 29, 1994.

49. After failing to locate the record described by the plaintiff as DEA Drug Exhibit 6 using NADDIS, SARO contacted the DEA Atlanta, Georgia office and requested that the case agent conduct a search for the specific documents. Two (2) documents, totaling four (4) pages and consisting of a DEA Form 7, dated September 14, 1994, documenting the seizure of 165.9 grams of cocaine, and a ROI dated September 15, 1994, describing a surveillance report and the acquisition of three (3) drug exhibits that included DEA Drug Exhibit 6, were forwarded to SARO by the case agent.

50. The pages obtained from the DEA Atlanta Georgia office were subsequently processed by SARO. The information on the pages does not correspond to the plaintiff's request for information regarding Government Exhibit 6 that related to a seizure of approximately one-half kilo of cocain that occurred on September 29, 1994. The three-page ROI and a drug seizure report document an event, surveillance and seizure; the seizure involved a third-party and a coded confidential source that did not involve the plaintiff; the seizure occurred on a date prior to that described by the plaintiff; and, the quantity of cocaine was different from that stated by the plaintiff.

-13-

51. Accordingly, the pages are not responsive to the plaintiff's request.

## WITHHOLDING PURSUANT TO PA EXEMPTION (j)(2) AND FOIA EXEMPTIONS (b)(2), (b)(7)(C) AND (b)(7)(D)

52. Notwithstanding the fact that DEA Drug Exhibit 6 and the associated ROI contained in DEA Investigative Case File No. G3-0100 does not correspond with the description of the record contained in his request, the reports contained in IRFS relate to a third-party and, if released, could disclose the identity of a coded confidential source.

53. IRFS is a Privacy Act System of Records that was last reported at 77 Fed. Reg. 3410 and last published in its entirety at 61 Fed. Reg. 54219. As Privacy Act systems of records, except when exempt, the conditions of disclosure are, in pertinent part, (a) pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains or providing proof of death, (b) unless disclosure of the record would be required under the Freedom of Information Act, 5 U.S.C. § 552, (c) pursuant to a routine use, or (d) pursuant to the order of a court of competent jurisdiction.

54. The DOJ Agency Rules, 28 CFR § 16.3, also require as a requisite, in pertinent part, that when "making a request for records about another individual, either a written authorization signed by that individual permitting disclosure of those records to you or proof that the individual is deceased (example omitted) will help with the processing of your request." In accordance with

-14-

at 68. Furthermore, the agency is not required to speculate about potential leads to the location of the responsive documents. <u>Kowalczyk v. Department of Justice</u>, 73 F.3d 386, 389 (D.C. Cir. 1996).

Despite the flaws in Plaintiff's request, DEA undertook a search that was more than reasonable. Based upon Plaintiff's description of the records he sought, the information was reasonably likely to be found in IRFS. Little Decl., ¶ 47. No other record system maintained by DEA is reasonably likely to contain the information requested by Plaintiff. <u>Id.</u> SARO conducted a NADDIS query on September 8, 2006, and did not locate any documents meeting the criteria set out in the Plaintiff's request from DEA investigative file GS-94-0100 of a DEA 7, Report of Drug Property Collected, Purchased, or Seized, and a DEA Form 6, Report of Investigation, dated September 29, 1994. Little Decl., ¶ 48.

After failing to locate the record described by Plaintiff as DEA Drug Exhibit 6 using NADDIS, SARO contacted the DEA Atlanta, Georgia office and requested that the case agent conduct a search for the specific documents. Little Decl., ¶ 49. Two (2) documents, totaling four (4) pages and consisting of a DEA Form 7, dated September 14, 1994, documenting the seizure of 165.9 grams of cocaine, and a ROI dated September 15, 1994, describing a surveillance report and the acquisition of three (3) drug exhibits that included DEA Drug Exhibit 6, were forwarded to SARO by the case agent. <u>Id.</u> The pages obtained from the Atlanta, Georgia office of DEA were subsequently processed by SARO. Little Decl., ¶ 50. However, the information in the documents did not correspond to Plaintiff's request for information regarding Government Exhibit 6 that is related to a seizure of approximately one-half kilogram of cocaine that occurred on September 29, 1994. <u>Id.</u> The three-page ROI and a drug seizure report document an event, surveillance and seizure; the seizure involved a third-party and a coded confidential source and did not involve the

25

Plaintiff; the seizure occurred on a date prior to that described by the Plaintiff; and, the quantity of cocaine was different from that stated by the Plaintiff. Id. Accordingly, the pages are not responsive to the Plaintiff's request. Little Decl., ¶ 51.

Through the declaration of an official responsible for responding to FOIA requests, the DEA has clearly established that it has conducted a search reasonably calculated to uncover all responsive records and that no responsive records were located.

**D.    The Declaration of William Little Is An Adequate <u>Vaughn</u> Index.**

The Declaration of William Little satisfies the fundamental legal requirements for a <u>Vaughn</u> Index. This Declaration consists of twenty-four pages and eighty paragraphs. It describes with particularity each document by describing, where possible, the type of document and its general subject matter. In particular, paragraphs 77 and 78 describe the contents of all the documents at issue in this case. Little Decl., ¶¶ 77, 78. This information and descriptions satisfy the "reasonable basis to evaluate the claim of privilege" standard set forth in <u>Delaney</u>, 826 F.2d at 128.

**E.    DEA's Withholding Complied with Privacy Act and FOIA Exemptions.**

**1.    DEA Properly Relied on PA Exemption (j)(2)**

Notwithstanding the fact that DEA Drug Exhibit 6 and the associated ROI contained in DEA Investigative Case File No. G3-0100 did not correspond to the description of the record contained in his request, the reports found through searching IRFS relate to a third-party and, if released, could disclose the identity of a coded confidential source. Little Decl., ¶ 52.

IRFS is a system of records under the Privacy Act that was last reported at 66 Fed. Reg. 8425 and last published in its entirety at 61 Fed. Reg. 54219. Little Decl., ¶ 53. As a Privacy Act system of records, except when exempt, the conditions of disclosure are, in pertinent part, (a) pursuant to

## IV.    CONCLUSION

WHEREFORE, the Defendant respectfully submits that this motion for summary judgment should be granted and that the Court should enter judgment in its favor.

Respectfully submitted,

/s/

JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

/s/

RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

/s/

OLIVER W. McDANIEL, D.C. Bar #377360
Assistant United States Attorney
Civil Division
555 4th Street, N.W.,
Washington, D.C. 20530
(202) 616-0739

Counsel for the Defendant

35

## CERTIFICATE OF SERVICE

I certify that copies of the foregoing Defendant's Motion for Summary Judgment, Statement

of Material Facts, Memorandum in Support of the Motion, and proposed order were served upon *pro*

*se* plaintiff by depositing copies in the U.S. Mail, first class postage prepaid, addressed to:

**ORESTE BRUZON**
**No. 43855-019**
**COLEMAN LOW**
**FEDERAL CORRECTIONAL INSTITUTION**
**Inmate Mail/Parcels**
**P.O. BOX 1031**
**COLEMAN, FL 33521**

on this 3rd day of October 2007.

_____
OLIVER W. McDANIEL
Assistant United States Attorney
Civil Division
555 4th Street, N.W.,
Washington, D.C. 20530

about individuals who were involved or associated with Plaintiff or with a law enforcement investigation. Little Decl., ¶ 62. These individuals include third parties, suspects, co-defendants, and confidential sources of information. Id.

26.     Sources of information include those to whom express confidentiality was granted and those about whom, based upon the facts and circumstances, confidentiality could be implied. Little Decl., ¶ 69.

27.     The information at issue here pertains to a coded confidential informant with a express assurance of confidentiality. Little Decl., ¶ 70.

28.     Coded informants are individuals who have a continuing cooperative association, by written signed agreement, with DEA. Such cooperative arrangements are established and maintained according to DEA policy and procedure. Little Decl., ¶ 71. These individuals are expressly assured confidentiality in their identities and the information they provide to DEA. Id. They are also assured that their names will not be used in DEA investigative materials. Id. They are assigned an identification code which is used in place of their name or referred to as CI, SOI, or CS. Id.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

OLIVER W. McDANIEL, D.C. Bar #377360
Assistant United States Attorney

October 3, 2007

8

#3

443

1   ALL, GOVERNMENT'S EXHIBITS 13 AND 13-A.

2   A.   13?

3   Q.   13 AND 13-A.   DO YOU SEE THOSE?

4   A.   YES, SIR.

5   Q.   ARE THE CONTENTS OF THOSE TWO PACKAGES FAMILIAR TO YOU?

6   A.   YES, THEY ARE, IN THE SAME WAY.

7   Q.   SAME WAY AS EXHIBIT 6?

8   A.   YES.   YOU CAN SEE MY INITIALS AND MY NAME HERE AND HERE.

9   Q.   IS THERE SOME RELATIONSHIP BETWEEN THE CONTENTS OF 13-A AND

10   13?

11   A.   YES, THERE ARE.

12   Q.   AND HOW?

13   A.   IT'S A FINGERPRINT SITUATION.

14   Q.   WELL, LET ME JUST ASK YOU, WHAT'S IN 13-A?   WHAT IS IT?

15   A.   13-A IS THE ORIGINAL WRAPPER THAT WAS WRAPPING THIS WHITE

16   SUBSTANCE.   I HAVE TO SUBMIT IT FOR FINGERPRINT BECAUSE OF

17   REQUEST TO ANALYSIS FOR FINGERPRINT.   THIS IS THE WRAPPER OF

18   THIS WHEN I HAD IT FIRST TIME.

19   Q.   OKAY.   DID YOU CONDUCT ANY TESTS ON THE CONTENTS OF WHAT --

20   OF THE BAG EXHIBIT 13?

21   A.   YES, I DID TESTS ON THIS WHITE SUBSTANCE.

22   Q.   AND WAS IT THE SAME TEST THAT YOU DESCRIBED EARLIER FOR

23   EXHIBIT 6?

24   A.   YES, THAT'S CORRECT, THE SAME TYPE OF TESTS.

25   Q.   AS A RESULT OF YOUR TESTS, WERE YOU ABLE TO ARRIVE AT AN

RUFUS L. HIXON

445

1  A.   I DID.

2  Q.   WHAT IS THAT OPINION?

3  A.   ONE MORE TIME I FOUND COCAINE HYDROCHLORIDE WITH A STRENGTH

4  OF 80 PERCENT, AND THE NET WEIGHT, JUST THE WHITE SUBSTANCE,

5  83.6 GRAMS.

6          MR. ANDERSON:  EXCUSE ME.  THANK YOU.  THAT'S ALL,

7  JUDGE.

8          THE COURT:  THANK YOU.  MR. COOK.

9          MR. COOK:  YOUR HONOR, I DON'T BELIEVE I HAVE ANY

10  QUESTIONS.  I WOULD JUST LIKE TO SEE THE EXHIBITS JUST A

11  MOMENT.

12          THE COURT:  ALL RIGHT.

13          MR. COOK:  NO QUESTIONS.

14          THE COURT:  ALL RIGHT, MR. JONES.

15          MR. JONES:  THANK YOU, JUDGE.

16              - - - -

17              CROSS-EXAMINATION

18  BY MR. JONES:

19  Q.   DR. MORALES, I'M DAVE JONES.  JUST ONE OR TWO QUESTIONS FOR

20  YOU, SIR.

21          WAS IT EXHIBIT 6 THAT YOU IDENTIFIED AS CONTAINING

22  THE ROUGHLY 490 GRAMS OF COCAINE?  AM I CORRECT ABOUT THAT?

23  A.   THE BIGGEST NUMBER, YES, EXHIBIT 6.

24  Q.   AND ALL THIS IS EXHIBIT 6?  THERE'S NO 6-A?

25  A.   NOT IN THIS CASE, NO.

RUFUS L. HIXON

1    A.   I DID.

2    Q.   WHAT IS THAT OPINION?

3    A.   ONE MORE TIME I FOUND COCAINE HYDROCHLORIDE WITH A STRENGTH

4    OF 80 PERCENT, AND THE NET WEIGHT, JUST THE WHITE SUBSTANCE,

5    83.6 GRAMS.

6           MR. ANDERSON:  EXCUSE ME.  THANK YOU.  THAT'S ALL,

7    JUDGE.

8           THE COURT:  THANK YOU.  MR. COOK.

9           MR. COOK:  YOUR HONOR, I DON'T BELIEVE I HAVE ANY

10   QUESTIONS.  I WOULD JUST LIKE TO SEE THE EXHIBITS JUST A

11   MOMENT.

12          THE COURT:  ALL RIGHT.

13          MR. COOK:  NO QUESTIONS.

14          THE COURT:  ALL RIGHT, MR. JONES.

15          MR. JONES:  THANK YOU, JUDGE.

16                       - - - -

17                   CROSS-EXAMINATION

18   BY MR. JONES:

19   Q.   DR. MORALES, I'M DAVE JONES.  JUST ONE OR TWO QUESTIONS FOR

20   YOU, SIR.

21          WAS IT EXHIBIT 6 THAT YOU IDENTIFIED AS CONTAINING

22   THE ROUGHLY 490 GRAMS OF COCAINE?  AM I CORRECT ABOUT THAT?

23   A.   THE BIGGEST NUMBER, YES, EXHIBIT 6.

24   Q.   AND ALL THIS IS EXHIBIT 6?  THERE'S NO 6-A?

25   A.   NOT IN THIS CASE, NO.

RUFUS L. HIXON

#5

145

1   HOUSE, IS THAT THE -- IS THAT THE PLACE THAT YOU IDENTIFIED

2   EARLIER AS GOVERNMENT'S EXHIBIT NO. 12?

3   A.   YES, THAT IS.

4   Q.   OKAY.   NOW, WHY IS IT THAT YOU WERE GOING TO GO TO HIS

5   HOUSE ON THAT DAY?

6   A.   BUY HALF A KEY, KILO, COCAINE.

7   Q.   HOW MUCH HAD YOU -- HAD YOU DISCUSSED HOW MUCH IT WAS GOING

8   TO COST?

9   A.   YES, WE DID.

10  Q.   WHAT WAS THE PRICE GOING TO BE, IF YOU RECALL?

11  A.   IT WAS ELEVEN, I THINK.

12  Q.   YOU THINK IT WAS ELEVEN.   ELEVEN WHAT?

13  A.   ELEVEN THOUSAND.

14  Q.   DOLLARS?

15  A.   $11,000.

16  Q.   I'M NOT --

17  A.   I DON'T REMEMBER VERY WELL.

18  Q.   DID THERE COME A TIME BEFORE -- DID THERE COME A TIME ON

19  SEPTEMBER 29TH OF '94 THAT YOU WENT TO HIS HOUSE?

20  A.   DECEMBER -- YES.

21  Q.   DID YOU GO THERE ON THAT DATE?

22  A.   ON THAT DATE, YES, I DID, 29TH.

23  Q.   WHO WENT WITH YOU?   ANYBODY?

24  A.   SANTOS AND ME, WE WENT TO THE HOUSE, I MEAN, AND THE

25  AGENTS.

RUFUS L. HIXON

1  Q.  WHAT EXACTLY HAPPENED WHEN MR. BRUZON SHOWED UP?

2  A.  HE TOLD ME THAT, "I'M GOING TO GO IN FIVE MINUTES, IN FIVE

3  MINUTES YOU GO AFTER ME, YOU GO TO MY HOUSE."

4  Q.  DID YOU DO THAT?

5  A.  YES, I DID.

6  Q.  OKAY.  AND WHAT HAPPENED WHEN YOU GOT TO HIS HOUSE?

7  A.  WE WENT TO THE STORAGE ROOM OUTSIDE BY THE GARAGE.  HE

8  PULLED OUT A KILO, KILO OF COCAINE, AND A SCALE, AND I TOOK THE

9  SCALE AND HE TOOK THE KILO, AND WE WENT TO THE KITCHEN, AND I

10 HELPED HIM BREAK IT AND WEIGH IT.

11 Q.  WAS THERE ANYBODY ELSE HOME?

12 A.  NO, JUST ME IN THE KITCHEN, RIGHT THERE IN THE KITCHEN.  I

13 DON'T SEE NOBODY ELSE.

14 Q.  DO YOU REMEMBER HOW IT WAS PACKAGED?

15 A.  WITH THE SILVER --

16 Q.  TAPE?

17 A.  TAPE.

18 Q.  HOW MUCH DID YOU GET FROM HIM THAT DAY?

19 A.  HALF A KILO.

20 Q.  OF COCAINE?

21 A.  YES.

22 Q.  AND WHAT DID YOU DO WITH IT?

23 A.  I JUST -- I JUST PUT -- I JUST PUT THEM LIKE THIS UNDER MY

24 ARM AND GOT OUT.  AND THEN AS SOON AS I GOT OUT THE AGENTS

25 FOLLOW ME, AND THEN WE STOPPED ON SHALLOWFORD ROAD, PLACE OVER

RUFUS L. HIXON

329

1  A.  HE WAS STANDING OUTSIDE HIS HOUSE.

2  Q.  IN FRONT OF THE FRONT DOOR, I ASSUME, IN THE DRIVEWAY?

3  A.  IN THE DRIVEWAY.

4  Q.  IN THE DRIVEWAY.

5        AND YOU INDICATED THAT YOU WALKED AROUND TO THE SIDE

6  OF THE HOUSE, TO THE RIGHT SIDE OF THE HOUSE, AND THAT THIS

7  CONTRABAND THAT YOU SAY WAS THERE WAS IN A STORAGE SHED?

8  A.  YES, SIR.

9  Q.  JUST LIKE A STORAGE SHED WHERE A LOT OF PEOPLE KEEP THEIR

10  GARDEN TOOLS, SHOVELS, AND HOSE, AND THINGS LIKE THAT?

11  A.  THERE WAS A TABLE THERE, TOO.

12  Q.  THERE'S A TABLE THERE?

13  A.  YES.

14  Q.  SO THIS IS, WHAT, A LITTLE WOODEN SHED OR METAL SHED?  DO

15  YOU REMEMBER?

16  A.  NO, I DON'T.

17  Q.  BUT IT WAS JUST A SHED OUTSIDE THAT, ACCORDING TO YOUR

18  TESTIMONY, HE OPENED UP, AND INSIDE OF IT WAS SCALES AND

19  CONTRABAND?

20  A.  HE GOT A WHOLE KILO OF COCAINE.

21  Q.  YOU HAVE SAID THAT HE WAS VERY NERVOUS AND ACTING VERY

22  NERVOUS; YET YOU HAVE INDICATED THAT HE WANTED TO DIVIDE THE

23  SUBSTANCE UP RIGHT THERE, RIGHT OUTSIDE.

24  A.  NO.  HE WAS GOING TO CLOSE THE DOOR AND DO INSIDE.  I SAID

25  PROBABLY HE'S GOING TO TOUCH ME OR SOMETHING, BECAUSE IT WAS

RUFUS L. HIXON

641

1  A.  UNH HUNH (AFFIRMATIVE).

2  Q.  IS THAT CORRECT?

3  A.  THAT'S CORRECT.

4  Q.  AND THIS IS THE HOUSE OF ORESTES BRUZON?

5  A.  YES, IT IS.

6  Q.  AND YOU HAVE BEEN PRESENT DURING THIS TRIAL DURING ALL THE

7  TESTIMONY, HAVEN'T YOU?

8  A.  YES, I HAVE.

9  Q.  THEN YOU WOULD HAVE HEARD DANNY CAMACARRO SAY THAT THE

10 TRANSACTION THAT HE SAYS HAPPENED HAPPENED BY HIM GOING TO THE

11 RIGHT-HAND SIDE OF THIS HOUSE, WHICH WOULD BE THIS SIDE RIGHT

12 HERE, AND RETRIEVING SOME CONTRABAND FROM A STORAGE SHED

13 OUTSIDE; ISN'T THAT CORRECT?

14 A.  I DON'T RECALL WHICH SIDE DANNY SAID HE WENT TO, BUT I DO

15 RECALL HIM SAYING HE HAD GONE TO A STORAGE SHED.

16 Q.  THAT WAS ON THE SIDE OF THE HOUSE?

17 A.  CORRECT.

18 Q.  OUTSIDE OF THE HOUSE?

19 A.  YES.

20       MR. JONES:  THAT'S ALL THE QUESTIONS I HAVE.

21       THE COURT:  THANK YOU.  MR. KESSLER.

22       MR. KESSLER:  NO QUESTIONS.

23       THE COURT:  THANK YOU.  ANYTHING FURTHER?

24       MR. ANDERSON:  NO, SIR.

25       THE COURT:  YOU MAY BE EXCUSED.

RUFUS L. HIXON

#6

672

1   A.   NO.

2   Q.   AND YOU HADN'T BEEN WITH HIM THE DAY BEFORE OR SUBSEQUENT

3   TO THE DAY BEFORE EXCEPT SHORT PERIODS OF TIME, IS THAT

4   CORRECT?

5   A.   THAT'S CORRECT.

6   Q.   AND, BASED ON YOUR INVESTIGATION, YOU KNOW DANNY CAMACARRO

7   HAD A LOT OF DIFFERENT SOURCES FOR COCAINE, DIDN'T HE?

8   A.   YES, HE DID.

9   Q.   AND HE HAD WORKED IN THIS BUSINESS FOR A LONG TIME; IN

10  FACT, I BELIEVE HE TOLD YOU AND OTHER AGENTS ABOUT LOSING KILOS

11  AND KILOS AND KILOS OF COCAINE IN THE PAST?

12  A.   YES, SIR.

13  Q.   AND ISN'T IT TRUE THAT ON THIS DATE, ON THE 29TH OF

14  SEPTEMBER, THIS WAS ONLY ABOUT FIVE OR SIX WEEKS AFTER DANNY

15  CAMACARRO HAD BEEN ARRESTED --

16  A.   YES, SIR.

17  Q.   -- BY YOU AND OTHERS?

18  A.   YES, SIR.

19  Q.   NOW --

20         MR. JONES:   JUDGE, MAY I APPROACH THE WITNESS FOR A

21  MOMENT?

22         THE COURT:   SURE.

23  BY MR. JONES:

24  Q.   LIKE TO SHOW YOU WHAT HAS BEEN MARKED GOVERNMENT'S 12 AND

25  ASK IF YOU CAN IDENTIFY IT.

RUFUS L. HIXON

674

1  YET.

2          MR. JONES:  NO.  I PUT MARKS ON.  I WANT TO BE SURE.

3  JUDGE, MAY I APPROACH THE WITNESS AGAIN?

4          THE COURT:  SURE.

5  BY MR. JONES:

6  Q.  I WOULD LIKE TO SHOW YOU WHAT HAVE BEEN MARKED AS

7  DEFENDANTS' 1 AND 2, STARTING WITH 1, AND ASK YOU IF YOU CAN

8  IDENTIFY THOSE PHOTOGRAPHS.

9  A.  APPEARS TO BE THE RESIDENCE OF BRUZON.

10 Q.  THE SAME RESIDENCE DEPICTED IN GOVERNMENT'S 12, IS THAT

11 CORRECT?

12 A.  THAT'S CORRECT.

13 Q.  AND FROM THOSE TWO PHOTOGRAPHS YOU CAN SEE BOTH THE LEFT

14 EXTERIOR OF THE HOUSE AND THE RIGHT EXTERIOR OF THE HOUSE, CAN

15 YOU NOT?

16 A.  YES.

17 Q.  IS THERE A STORAGE SHED ON EITHER SIDE OF THAT HOUSE?

18 A.  WELL, YOU'VE GOT A PRIVACY FENCE HERE, SO I REALLY CAN'T

19 SEE IF THERE'S ONE OR NOT.

20 Q.  ON EXHIBIT -- ON STATE'S -- ON DEFENDANT'S EXHIBIT 2, IS

21 THERE A PRIVACY FENCE ON THE RIGHT-HAND SIDE?

22 A.  YES, SIR.  YOU CAN SEE A PRIVACY FENCE HERE AND A PRIVACY

23 FENCE HERE, ON THE LEFT AND THE RIGHT-HAND SIDE.

24 Q.  WELL, DO YOU SEE, IN THE PHOTOGRAPHS DEPICTED, DO YOU SEE

25 ON THE EXTERIOR OF THAT HOUSE A STORAGE SHED?

RUFUS L. HIXON

675

1  A.  NO, SIR.

2  Q.  NOW, DURING YOUR TIME OF LOOKING AT THAT HOUSE, DID YOU

3  EVER RECALL NOTICING A STORAGE SHED ON THE RIGHT-HAND SIDE OF

4  THAT HOUSE NEAR THE DRIVEWAY?

5  A.  NO, SIR.

6          MR. JONES:  JUDGE, I WOULD TENDER DEFENDANTS' 1 AND

7  2.

8          THE COURT:  MR. ANDERSON.

9          MR. ANDERSON:  NO OBJECTION.

10          THE COURT:  ADMITTED WITHOUT OBJECTION.

11          MR. JONES:  THAT'S ALL THE QUESTIONS I HAVE, JUDGE.

12          THE COURT:  THANK YOU.  MR. KESSLER.

13                    - - - -

14                 CROSS-EXAMINATION

15  BY MR. KESSLER:

16  Q.  MORNING, INVESTIGATOR PEREZ.

17  A.  MORNING.

18  Q.  I WANT TO GO BACK OVER THE EVENTS OF SEPTEMBER 29TH, 1994,

19  AGAIN, VERY BRIEFLY.

20  A.  OKAY.

21  Q.  YOU TESTIFIED THAT YOU WERE CONDUCTING SURVEILLANCE AT THE

22  RESTAURANT, CHARRO II?

23  A.  THAT'S CORRECT.

24  Q.  THAT'S ON BUFORD HIGHWAY?

25  A.  THAT'S CORRECT.

RUFUS L. HIXON

#7

```
                                                      144
1   CONDUCT SOME BUSINESS WITH SANTOS BRUZON?

2   A.   YES.

3   Q.   AND WHAT WAS THAT BUSINESS?

4   A.   BUYING HALF A KILO FROM HIM.

5   Q.   HOW DID IT COME ABOUT THAT THAT HALF A KILO DEAL TOOK

6   PLACE?  WHAT DID YOU DO?

7   A.   I CALLED HIM AT EL CHARRO RESTAURANT.  HE WASN'T THERE.  HE

8   WAS AT LAKE LANIER.  THEN WE WAIT UNTIL SIX OR SEVEN O'CLOCK,

9   AND HE WASN'T THERE.  TALKED TO HIS WIFE.  SHE TOLD ME THAT HE

10  WAS AWAY.  AND THEN I WENT TO EL CHARRO, AND I STAYED THERE

11  ABOUT 20 MINUTES, 30 MINUTES, AND HE SHOWED UP, AND HE TOLD ME,

12  YOU KNOW:  "I'M GOING TO GO FIRST, AND AFTER FIVE MINUTES YOU

13  GO."

14  Q.   GOING TO GO WHERE FIRST?

15  A.   TO HIS HOUSE.

16  Q.   WHY DID YOU CONTACT HIM ON THAT DATE?  FIRST OF ALL, WHO

17  TOLD YOU TO DO THAT?

18  A.   THE AGENTS.

19  Q.   DO YOU REMEMBER WHICH AGENTS?

20  A.   JIMMY STEARNS --

21  Q.   MR. STEARNS HERE?

22  A.   UNH HUNH (AFFIRMATIVE).  MR. DAN SINDALL.

23  Q.   MR. SINDALL.  SO YOU CALLED THEM UP ON THE PHONE?

24  A.   YES.

25  Q.   ALL RIGHT.  AND WHEN YOU SAY YOU WERE GOING TO GO TO HIS
```

RUFUS L. HIXON

145

1  HOUSE, IS THAT THE -- IS THAT THE PLACE THAT YOU IDENTIFIED

2  EARLIER AS GOVERNMENT'S EXHIBIT NO. 12?

3  A.  YES, THAT IS.

4  Q.  OKAY.  NOW, WHY IS IT THAT YOU WERE GOING TO GO TO HIS

5  HOUSE ON THAT DAY?

6  A.  BUY HALF A KEY, KILO, COCAINE.

7  Q.  HOW MUCH HAD YOU -- HAD YOU DISCUSSED HOW MUCH IT WAS GOING

8  TO COST?

9  A.  YES, WE DID.

10  Q.  WHAT WAS THE PRICE GOING TO BE, IF YOU RECALL?

11  A.  IT WAS ELEVEN, I THINK.

12  Q.  YOU THINK IT WAS ELEVEN.  ELEVEN WHAT?

13  A.  ELEVEN THOUSAND.

14  Q.  DOLLARS?

15  A.  $11,000.

16  Q.  I'M NOT --

17  A.  I DON'T REMEMBER VERY WELL.

18  Q.  DID THERE COME A TIME BEFORE -- DID THERE COME A TIME ON

19  SEPTEMBER 29TH OF '94 THAT YOU WENT TO HIS HOUSE?

20  A.  DECEMBER -- YES.

21  Q.  DID YOU GO THERE ON THAT DATE?

22  A.  ON THAT DATE, YES, I DID, 29TH.

23  Q.  WHO WENT WITH YOU?  ANYBODY?

24  A.  SANTOS AND ME, WE WENT TO THE HOUSE, I MEAN, AND THE

25  AGENTS.

RUFUS L. HIXON

146

1    Q.   WHERE WERE THE AGENTS, IF YOU KNOW?

2    A.   THEY PARK ALL AROUND THE HOUSE.

3    Q.   ALL AROUND THE HOUSE?

4    A.   YES.

5    Q.   DID THERE COME A TIME WHEN YOU WENT IN THE HOUSE?

6    A.   YES.

7    Q.   WHEN YOU FIRST MET WITH THE AGENTS, WHAT STEPS, IF ANY, DID

8    THEY TAKE TO TRY TO RECORD A CONVERSATION?

9    A.   WELL, THEY WIRED ME, AND THEN THEY CHECKED ME OUT, CHECKED

10   ALL -- EVERYTHING, CHECKED MY CAR.

11   Q.   WHEN THEY SAY THEY CHECKED YOU OUT, WHAT DID THEY DO?

12   A.   THEY CHECKED MY POCKETS TO SEE IF I HAVE ANY MONEY.

13   Q.   THEY SEARCHED YOU?

14   A.   THEY SEARCHED ME, YES.

15   Q.   WHO DID THAT, DO YOU REMEMBER?

16   A.   A DETECTIVE MANNY PEREZ.

17   Q.   FROM WHAT DEPARTMENT?

18   A.   GWINNETT COUNTY.

19   Q.   AND WHAT DID THEY DO TO YOUR CAR?

20   A.   THEY CHECKED THE CAR, CHECKED ALL OVER THE CAR, INSIDE THE

21   CAR.

22   Q.   AND THEY WIRED YOU UP?

23   A.   RIGHT.

24   Q.   AND AFTER THAT HAPPENED YOU WENT TO THIS RESTAURANT?

25   A.   I WENT TO THE RESTAURANT.

RUFUS L. HIXON

147

1  Q.  WHAT EXACTLY HAPPENED WHEN MR. BRUZON SHOWED UP?

2  A.  HE TOLD ME THAT, "I'M GOING TO GO IN FIVE MINUTES, IN FIVE

3  MINUTES YOU GO AFTER ME, YOU GO TO MY HOUSE."

4  Q.  DID YOU DO THAT?

5  A.  YES, I DID.

6  Q.  OKAY.  AND WHAT HAPPENED WHEN YOU GOT TO HIS HOUSE?

7  A.  WE WENT TO THE STORAGE ROOM OUTSIDE BY THE GARAGE.  HE

8  PULLED OUT A KILO, KILO OF COCAINE, AND A SCALE, AND I TOOK THE

9  SCALE AND HE TOOK THE KILO, AND WE WENT TO THE KITCHEN, AND I

10  HELPED HIM BREAK IT AND WEIGH IT.

11  Q.  WAS THERE ANYBODY ELSE HOME?

12  A.  NO, JUST ME IN THE KITCHEN, RIGHT THERE IN THE KITCHEN.  I

13  DON'T SEE NOBODY ELSE.

14  Q.  DO YOU REMEMBER HOW IT WAS PACKAGED?

15  A.  WITH THE SILVER --

16  Q.  TAPE?

17  A.  TAPE.

18  Q.  HOW MUCH DID YOU GET FROM HIM THAT DAY?

19  A.  HALF A KILO.

20  Q.  OF COCAINE?

21  A.  YES.

22  Q.  AND WHAT DID YOU DO WITH IT?

23  A.  I JUST -- I JUST PUT -- I JUST PUT THEM LIKE THIS UNDER MY

24  ARM AND GOT OUT.  AND THEN AS SOON AS I GOT OUT THE AGENTS

25  FOLLOW ME, AND THEN WE STOPPED ON SHALLOWFORD ROAD, PLACE OVER

RUFUS L. HIXON

148

1   THERE NEAR THE CHURCH, AND WE STOPPED THERE, AND THEY GOT THE

2   COCAINE.  THEN THEY GOT A CAMERA AND RECORDED IT.

3   Q.  OKAY.

4        DURING THE TIME YOU WERE IN SANTOS BRUZON'S HOUSE,

5   WHAT CONVERSATIONS, IF ANY, DID YOU HAVE WITH HIM?

6   A.  HE WAS WHISPERING.

7   Q.  HE WAS WHISPERING?

8   A.  YES.

9   Q.  DO YOU KNOW WHY?

10   A.  NO, I DON'T.  I THINK HE WAS HIGH.

11   Q.  DID HE MAKE ANY GESTURES OR STATEMENTS TO YOU?

12   A.  YES.  HE DID.

13   Q.  HE PUT HIS FINGER UP TO HIS LIPS?

14   A.  YES.

15   Q.  LIKE TO BE QUIET?

16   A.  YES.

17   Q.  WHAT ABOUT PAYMENT FOR THAT COCAINE, HOW DID YOU DO THAT?

18   A.  HE CAME AND GAVE ME THE MONEY.

19   Q.  HE GAVE YOU THE MONEY?  WHO GAVE WHO THE MONEY?

20   A.  OH, I GAVE HIM THE MONEY.

21   Q.  OKAY.  YOU GAVE HIM THE MONEY WHERE?

22   A.  IN THE KITCHEN, I GAVE HIM THE MONEY IN THE KITCHEN.

23   Q.  HOW MUCH DID YOU GIVE HIM?

24   A.  IT WAS ELEVEN THOUSAND, TWELVE THOUSAND DOLLARS.  I DON'T

25   KNOW.  ELEVEN THOUSAND.  I DON'T REMEMBER.

RUFUS L. HIXON

235

1  Q.  SINCE THEN, NO OTHER APPEARANCES; IS THAT CORRECT?

2  A.  NO.

3  Q.  PART OF YOUR ARRANGEMENT WITH THE F.B.I. AND D.E.A. IS THEY

4  ARE GOING TO HELP YOU WITH THAT CASE; ISN'T THAT CORRECT?

5  A.  YES.

6  Q.  DID THEY EXPLAIN TO YOU WHEN YOU WERE ARRESTED IN AUGUST OF

7  '94 WHAT YOU WERE FACING IN GWINNETT COUNTY FOR POSSESSING MORE

8  THAN THREE OUNCES OR ABOUT THREE OUNCES OF COCAINE?

9  A.  NOT THAT I REMEMBER.

10  Q.  YOU DON'T REMEMBER?

11  A.  NO.

12  Q.  YOU HAVEN'T BEEN TOLD WHAT YOUR POSSIBLE SENTENCE COULD BE?

13  A.  NO.

14  Q.  DID YOU UNDERSTAND THAT IT COULD BE A VERY SEVERE SENTENCE,

15  SIR?

16  A.  WELL, I'M LOOKING -- YES, I UNDERSTAND IT CAN BE VERY

17  SEVERE.

18  Q.  WITH SUBSTANTIAL JAIL TIME INVOLVED?

19      AND YOU ARE LOOKING FOR HELP FOR THIS INFORMATION

20  THAT YOU ARE GIVING SO THAT YOU DON'T HAVE TO GO TO JAIL; ISN'T

21  THAT CORRECT?

22  A.  NO.  I KNOW I HAVE TO GO TO JAIL.  AT LEAST I KNOW I GET

23  LESS YEARS.

24  Q.  MR. CAMACARRO, THE TAPES THAT WERE PLAYED TODAY THAT YOU

25  WERE A PARTICIPANT TO, ORESTES BRUZON, HE WAS NOT ON ANY OF

RUFUS L. HIXON

236

1  THOSE TAPES, WAS HE?

2  A.  NO, HE WASN'T.

3  Q.  LET'S TALK ABOUT THE, SPECIFICALLY, JUST TO BE SURE, THE

4  INCIDENT ON APRIL 7TH OF 1995, WHICH WAS THE TAPE THAT HAS BEEN

5  IDENTIFIED AS STATE'S TE-7.  THAT'S THE MEETING WITH CHINO

6  BRUZON-GONZALES.

7  A.  OKAY.

8  Q.  AND YOU WERE PRESENT IN THAT CONVERSATION, CORRECT?

9  A.  YES.

10  Q.  THAT WAS A CONVERSATION HELD AT EL CHARRO I RESTAURANT; IS

11  THAT CORRECT?

12  A.  YES.

13  Q.  AND THAT RESTAURANT BELONGS TO ORESTES BRUZON'S EX-WIFE; IS

14  THAT CORRECT?

15  A.  YES.

16  Q.  AND SHE'S OWNED IT FOR SOME TIME, HAS SHE NOT?

17  A.  SHE'S WHAT?

18  Q.  SHE'S OWNED IT FOR SOME TIME, HAS SHE NOT?

19  A.  YES.

20  Q.  AND ORESTES BRUZON WAS NOT PART OF THAT CONVERSATION THAT

21  YOU HAD WITH HIS SON ON THAT DAY; ISN'T THAT CORRECT?

22  A.  NO, I DIDN'T HEAR HIM.

23  Q.  HE WASN'T PART OF IT, WAS HE?

24  A.  NO.

25  Q.  HE'S NOT EVEN MENTIONED AS BEING PRESENT, WAS HE?

RUFUS L. HIXON

1  A.  NO.

2  Q.  HE WASN'T PRESENT, WAS HE?

3  A.  NO, HE WASN'T.

4  Q.  NOW, ON THE TRANSCRIPT THAT HAS BEEN IDENTIFIED AS TE-9,

5  WHICH IS THE MEETING THAT YOU HAD WITH CHINO, WITH

6  BRUZON-GONZALES, WHICH WAS THE NEXT TO LAST TAPE THAT WE HEARD,

7  DO YOU REMEMBER THAT MEETING, MEETING THAT OCCURRED ON JULY

8  12TH?

9  A.  JULY 12TH?  THE ONE THAT WAS -- THE ONE IN EL AMIGO?

10  Q.  I BELIEVE SO.  LET ME SHOW YOU THE TRANSCRIPT SO THAT YOU

11  CAN BE SURE WE ARE TALKING ABOUT THE SAME.

12  A.  OKAY.  OKAY.

13  Q.  YOU REMEMBER THAT?

14  A.  YES.

15  Q.  NOW, IN THAT MEETING, I WOULD LIKE TO DRAW YOUR ATTENTION

16  TO PAGE 18.  IF YOU WILL LOOK DOWN AT THE BOTTOM PART OF IT,

17  THE NEXT TO LAST THING THAT YOU SAY, WOULD YOU READ WHAT IT IS

18  THAT YOU SAID AT THAT TIME AT THAT CONVERSATION WHERE IT STARTS

19  "AND IS HE"?

20  A.  "AND IS HE -- IS HE -- IS SANTOS GOING TO BUY -- IS HE --

21  IS HE AND -- IS SANTOS GOING TO BUY?  IS HE GOING TO ASSOCIATE

22  HIMSELF WITH THE OTHER SANTOS OR WHAT?"

23  Q.  NOW, MR. CAMACARRO, THOSE ARE YOUR OWN WORDS, ISN'T THAT

24  CORRECT?  THAT WAS A TRANSCRIPT OF WHAT YOU SAID ON THAT DAY?

25  A.  UNH HUNH, YES.

#9

598

1   A.   NO, IT DID NOT.

2          MR. COOK:  THANK YOU.

3          THE COURT:  MR. JONES.

4          MR. JONES:  THANK YOU, JUDGE.

5                - - - -

6              CROSS-EXAMINATION

7   BY MR. JONES:

8   Q.   MORNING, INVESTIGATOR STEARNS.

9   A.   MORNING.

10  Q.   I'M DAVID JONES.  YOU PROBABLY KNOW THAT BY NOW?

11  A.   CORRECT.

12  Q.   SIR, I WOULD LIKE TO DRAW YOUR ATTENTION, FIRST, TO THE

13  4-7-95 INCIDENT.  THAT'S THE BUY THAT DANNY MADE FROM -- DANNY

14  CAMACARRO MADE FROM CHINO BRUZON?

15  A.   CORRECT.

16  Q.   IS THAT CORRECT?

17  A.   YES.

18  Q.   AND THAT OCCURRED AT THE CHARRO I RESTAURANT; IS THAT

19  CORRECT?

20  A.   CORRECT, ON LINDBERGH PLAZA.

21  Q.   ALL RIGHT.  AND, JUST SO THAT WE ARE STRAIGHT, THERE'S A

22  CHARRO I RESTAURANT AND THERE'S A CHARRO II RESTAURANT --

23  A.   RIGHT.

24  Q.   -- THAT HAVE BEEN MENTIONED IN THIS CASE?

25  A.   CORRECT.

RUFUS L. HIXON

599

1  Q.  THE CHARRO II RESTAURANT IS THE RESTAURANT THAT ORESTES

2  BRUZON OPERATED; IS THAT CORRECT?

3  A.  THAT'S CORRECT.

4  Q.  CHARRO I WAS THE RESTAURANT THAT ORESTES'S FORMER WIFE

5  OPERATES; IS THAT CORRECT?

6  A.  THAT'S CORRECT.

7  Q.  AND THIS MEETING THAT OCCURRED BETWEEN CHINO AND DANNY

8  CAMACARRO ON 4-7-95 HAPPENED AT CHARRO I; ISN'T THAT CORRECT?

9  A.  THAT'S CORRECT.

10  Q.  ALL RIGHT.  AND YOU WERE -- YOU MONITORED THE

11  TAPE, MONITORED THE MAKING OF THE TAPE THAT RESULTED FROM THAT

12  MEETING; IS THAT CORRECT?

13  A.  I COULD HEAR THE SAME TRANSMISSIONS THAT WERE BEING

14  RECORDED, CORRECT.

15  Q.  AND YOU, BASICALLY, EITHER YOU OR ANOTHER AGENT, HAD

16  INSTALLED THE KEL DEVICE ON DANNY CAMACARRO THAT DAY; IS THAT

17  CORRECT?

18  A.  YES.

19  Q.  AND THERE WAS A TAPE MADE FROM THAT ENCOUNTER; ISN'T THAT

20  CORRECT?

21  A.  YES, THERE WAS.

22  Q.  AND ON THAT TAPE IT WAS CLEAR THAT DANNY CAMACARRO WAS

23  TALKING TO CHINO BRUZON; ISN'T THAT CORRECT?

24  A.  YES.

25  Q.  AND IT WAS ALSO CLEAR AS TO WHAT THEY WERE DISCUSSING?

RUFUS L. HIXON

600

```
1   A.  YES.

2   Q.  WE HAVE ALL HEARD THAT TAPE?

3   A.  THAT'S TRUE.

4   Q.  AND, OF COURSE, INVESTIGATOR STEARNS, YOU WOULD AGREE THAT

5   ORESTES BRUZON IS NOT ON THAT TAPE?

6   A.  CORRECT.

7   Q.  HIS VOICE IS NOT ON THAT TAPE, AND NO ONE EVEN MENTIONS

8   THAT HE WAS PRESENT ON THAT OCCASION; ISN'T THAT CORRECT?

9   A.  THAT'S CORRECT.

10  Q.  NOW, YOU HAVE ALSO REFERRED TO TAPES THAT WERE MADE IN JULY

11  FROM ANOTHER TRANSACTION WITH CHINO BRUZON AND DANNY CAMACARRO;

12  ISN'T THAT CORRECT?

13  A.  YES.

14  Q.  AND THAT'S THE SAME TYPE OF RECORDING DEVICE THAT WAS SET

15  UP?

16  A.  YES.

17  Q.  IN FACT, THE JURORS HAVE HEARD SEVEN OR EIGHT TAPES IN

18  TOTAL THAT WERE MADE BY DANNY CAMACARRO; ISN'T THAT CORRECT?

19  A.  YES.

20  Q.  AND, IN FACT, THERE WERE OTHER TAPES THAT WERE MADE THAT

21  THEY HAVEN'T HEARD; ISN'T THAT CORRECT?

22  A.  YES.

23  Q.  OKAY.  AND IT WAS ALL USING THE SAME DEVICE, SAME KEL

24  DEVICE PUT ON DANNY CAMACARRO?

25  A.  CAMACARRO, YES, THAT'S CORRECT.
```

RUFUS L. HIXON

#5

#10

156

1      MR. ANDERSON:  I WOULD OFFER 5, YOUR HONOR.

2      MR. KESSLER:  NO OBJECTION, YOUR HONOR.

3      THE COURT:  ADMITTED WITHOUT OBJECTION.

4      MR. ANDERSON:  THANK YOU.

5  BY MR. ANDERSON:

6  Q.   NOW, MR. CAMACARRO, ON APRIL THE 7TH OF 1995 DID YOU HAVE

7  OCCASION TO MEET WITH JESUS-CHINO BRUZON ON THAT DAY?

8  A.   YES, SIR.

9  Q.   DID YOU HAVE OCCASION TO HAVE THAT CONVERSATION RECORDED?

10 A.   YES, SIR.

11 Q.   LET ME SHOW YOU WHAT WE HAVE MARKED AS GOVERNMENT'S EXHIBIT

12 NO. 7 AND ASK YOU IF YOU CAN IDENTIFY THAT?

13 A.   YES.

14 Q.   HOW?

15 A.   PUT MY INITIALS ON IT.

16 Q.   WHAT IS IT?

17 A.   IT'S A RECORDING.

18 Q.   OF WHAT?

19 A.   BETWEEN CHINO BRUZON AND ME.

20 Q.   AND WHAT DAY?

21 A.   4-7-95.

22 Q.   HAVE YOU LISTENED TO IT?

23 A.   YES, I HAVE.

24 Q.   CAN YOU TELL US WHETHER OR NOT THAT TAPE IS A FAIR AND

25 ACCURATE RECORDING OF YOUR CONVERSATION WITH JESUS BRUZON ON

RUFUS L. HIXON

157

1    THAT DAY?

2    A.  YES, IT IS.

3            MR. ANDERSON:  I WOULD OFFER IT, JUDGE.

4            THE COURT:  MR. KESSLER.

5            MR. KESSLER:  NO OBJECTION, YOUR HONOR.

6            THE COURT:  ADMITTED WITHOUT OBJECTION.

7            MR. ANDERSON:  THANK YOU.

8    BY MR. ANDERSON:

9    Q.  LET ME SHOW YOU NEXT WHAT IS MARKED AS GOVERNMENT'S EXHIBIT

10   NO. 8.  TAKE A LOOK AT IT, AND LET ME ASK YOU IF ON APRIL THE

11   7TH OF '95 YOU HAD A SECOND CONVERSATION WITH JESUS BRUZON?

12   A.  YES.

13   Q.  DID YOU HAVE ANOTHER CONVERSATION WITH HIM --

14   A.  YES.

15   Q.  -- ON THAT DAY?

16   A.  YES.

17   Q.  CAN YOU TELL ME WHETHER OR NOT YOU ARE FAMILIAR WITH WHAT I

18   HAVE MARKED AS GOVERNMENT'S EXHIBIT NO. 8?

19   A.  YES, I AM.

20   Q.  AND HOW DO YOU KNOW THAT?

21   A.  PUT MY INITIALS ON THERE.

22   Q.  WHAT IS THAT ITEM?

23   A.  A RECORDING BETWEEN CHINO BRUZON AND ME.

24   Q.  THE SECOND CONVERSATION?

25   A.  YES.

RUFUS L. HIXON

582

1  A.  WHEN IT ARRIVED FROM THE D.E.A. LABORATORY BACK HERE.

2  Q.  WHEN WOULD THAT HAVE BEEN?

3  A.  I BELIEVE IT WAS TWO DAYS AGO.

4          MR. ANDERSON:  YOUR HONOR, I WOULD NOW OFFER

5  GOVERNMENT'S EXHIBIT NO. 6.

6          THE COURT:  MR. COOK.

7          MR. COOK:  NO OBJECTION.

8          THE COURT:  MR. JONES.

9          MR. JONES:  NO OBJECTION, YOUR HONOR.

10         THE COURT:  MR. KESSLER.

11         MR. KESSLER:  NO OBJECTION, YOUR HONOR.

12         THE COURT:  ADMITTED WITHOUT OBJECTION.  GO AHEAD.

13         MR. ANDERSON:  THANK YOU.

14 BY MR. ANDERSON:

15 Q.  MR. STEARNS, LET ME NEXT INVITE YOUR ATTENTION TO THE DATE

16 OF APRIL 7TH, 1995, AND ASK YOU IF YOU HAD OCCASION TO CONDUCT

17 A SURVEILLANCE ON THAT DAY WHICH IS RELEVANT TO YOUR

18 INVESTIGATION IN THIS CASE?

19 A.  YES, I DID.

20 Q.  AND WHERE WAS THIS SURVEILLANCE CONDUCTED?

21 A.  THE SURVEILLANCE WAS CONDUCTED AT EL CHARRO I RESTAURANT.

22 Q.  AND WHY WERE YOU DOING THAT?

23 A.  DANNY CAMACARRO HAD MADE ARRANGEMENTS TO PURCHASE THREE

24 OUNCES OF COCAINE FROM CHINO, JESUS BRUZON.

25 Q.  AND CAN YOU TELL US WHAT YOU SAW DURING YOUR SURVEILLANCE?

RUFUS L. HIXON

652

1  HONOR.

2          THIS HAS BEEN ACCEPTED IN EVIDENCE, HAS IT NOT?

3          THE COURT:  YES, IT WAS ADMITTED IN EVIDENCE.

4          RAISE YOUR RIGHT HAND, PLEASE.

5          DO YOU SOLEMNLY SWEAR THAT THE EVIDENCE YOU SHALL

6  GIVE IN THE MATTER PENDING BEFORE THIS COURT SHALL BE THE

7  TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU

8  GOD?

9          THE WITNESS:  I DO.

10          THE COURT:  PLEASE BE SEATED.  I WANT YOU TO SPEAK

11  INTO THE MICROPHONES AND TALK LOUD ENOUGH SO THAT WE ALL CAN

12  HEAR YOUR TESTIMONY.

13          MR. ANDERSON, YOUR WITNESS.

14          MR. ANDERSON:  THANK YOU, JUDGE.

15                          — — —

16                  M A N U E L   P E R E Z

17  CALLED AS A WITNESS BY THE UNITED STATES, AFTER HAVING FIRST

18  BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

19                    DIRECT EXAMINATION

20  BY MR. ANDERSON:

21  Q.  STATE YOUR NAME AND SPELL YOUR LAST NAME, SIR.

22  A.  PEREZ.  FIRST NAME IS MANUEL.

23  Q.  P-E-R-E-Z?

24  A.  THAT'S CORRECT.

25  Q.  AND HOW ARE YOU EMPLOYED, MR. PEREZ?

RUFUS L. HIXON

723

D A N N Y   S I N D A L L

1

2  CALLED AS A WITNESS BY THE UNITED STATES, AFTER HAVING FIRST

3  BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

4                      DIRECT EXAMINATION

5  BY MR. ANDERSON:

6  Q.  SPELL YOUR LAST NAME, SIR.

7  A.  LAST NAME IS SPELLED S, AS IN SAM, I-N-D-A-L-L.

8  Q.  MR. SINDALL, HOW ARE YOU EMPLOYED?

9  A.  I'M A SPECIAL AGENT WITH THE FEDERAL BUREAU OF

10 INVESTIGATION.

11 Q.  HOW LONG HAVE YOU BEEN WITH THE F.B.I.?

12 A.  I HAVE BEEN AN AGENT FOR 21 YEARS, IN DECEMBER.

13 Q.  IN THE COURSE OF YOUR DUTIES WITH THE F.B.I. DID YOU HAVE

14 OCCASION TO CONDUCT A SURVEILLANCE ON SEPTEMBER THE 29TH, 1994?

15 A.  YES.

16 Q.  WHERE?

17 A.  IN THE VICINITY OF EL CHARRO II RESTAURANT ON BUFORD

18 HIGHWAY.

19 Q.  FOR WHAT PURPOSE?

20 A.  FOR THE PURPOSE OF SURVEILLING DANNY CAMACARRO, OUR SOURCE,

21 TO BUY A HALF A KILOGRAM OF COCAINE FROM SANTOS BRUZON.

22 Q.  WHO WAS WITH YOU?

23 A.  I WAS IN THE PRESENCE OF JAMES STEARNS, MANNY PEREZ, AND

24 INVESTIGATOR JOSE DIAZ WAS THERE, AGENT SKINNER WAS THERE,

25 ALONG WITH OTHER LAW ENFORCEMENT OFFICIALS CONNECTED WITH THIS

#12

(221)

1    A.   OKAY, YES, SIR.

2    Q.   SIR, I NOTED YESTERDAY WHEN YOU TOOK THE STAND INITIALLY

3    YOU IDENTIFIED YOURSELF AS MR. CAMACARRO.   WHAT IS YOUR FULL

4    CORRECT NAME, SIR, WHAT IS THE NAME YOU ARE TESTIFYING UNDER

5    TODAY?

6    A.   PAOLINO DANIEL CAMACARRO.

7    Q.   IS THAT THE ONLY NAME YOU HAVE EVER USED, SIR?

8    A.   NO.

9    Q.   YOU HAVE USED SOME OTHER NAMES, HAVEN'T YOU?

10   A.   YES.

11   Q.   IN FACT, SINCE 1990, BETWEEN 1990 AND 1994 YOU HAVE USED 13

12   OR 14 OR 15 DIFFERENT NAMES, HAVEN'T YOU?

13   A.   I DON'T REMEMBER THAT, NO, SIR.

14   Q.   WELL, HAVE YOU USED THE NAME "ANTONIO MEDINA" BEFORE?

15   A.   NOT ANTONIO MEDINA.   TONY MEDINA.

16   Q.   HAVE YOU USED THE NAME "ANTONIO MEDINA"?

17   A.   I DON'T REMEMBER.

18   Q.   I WILL COME BACK TO IT.

19          HOW ABOUT DANIEL CAMACARO WITH ONE "R"?

20   A.   WELL, YOU SPELL IT EVERY TIME -- IT IS SPELLED CAMACARRO,

21   SOMETIMES THEY PUT R-R.

22   Q.   WHAT ABOUT ANTONIO MEDANA, M-E-D-A-N-A?

23   A.   DANNY MEDINA I REMEMBER.

24   Q.   BUT YOU DON'T REMEMBER USING THE NAME "ANTONIO MEDANA"?

25   A.   NO, I DON'T.

RUFUS L. HIXON

DANIEL CAMACA.o

220

1          THE COURT:  YOU MAY STEP DOWN.

2          MR. ANDERSON:  IS HE EXCUSED, YOUR HONOR?

3          THE COURT:  YOU ARE EXCUSED.

4          THE WITNESS:  THANK YOU, YOUR HONOR.

5          THE COURT:  WE APPRECIATE YOUR TESTIMONY.

6              [WITNESS EXCUSED FROM THE STAND]

7          MR. ANDERSON:  RECALL MR. CAMACARRO, YOUR HONOR.

8          THE COURT:  THANK YOU.  I WANT YOU TO RETURN TO THE

9    WITNESS STAND.

10          MR. ANDERSON:  MR. CAMACARRO --

11          THE COURT:  ARE THERE ANY ADDITIONAL QUESTIONS YOU

12   WANT TO PUT TO HIM?

13          MR. ANDERSON:  I HAVE NOTHING FURTHER FROM THIS

14   WITNESS AT THIS TIME, YOUR HONOR.

15          THE COURT:  WE WILL PROCEED IN THE SAME ORDER.

16   MR. COOK.

17          MR. JONES:  JUDGE, WITH YOUR PERMISSION.

18          THE COURT:  ALL RIGHT, GO AHEAD.

19                  - - - -

20     P A O L I N O   D A N I E L   C A M A C A R R O

21   HAVING RETURNED TO THE STAND, TESTIFIED FURTHER AS FOLLOWS:

22                  CROSS-EXAMINATION

23   BY MR. JONES:

24   Q.  HELLO, MR. CAMACARRO.  MY NAME IS DAVID JONES.  I'M GOING

25   TO ASK YOU SOME QUESTIONS.  ALL RIGHT?

RUFUS L. HIXON

240

1   Q.  NOW, LET'S TALK ABOUT -- HOLD ON A SECOND.  IF IT WAS JUST

2   LIKE IT, THEN ARE YOU SAYING, NOW, IT WAS THREE OUNCES THAT YOU

3   BOUGHT ON THE PREVIOUS OCCASIONS, THAT YOU ARE BUYING THREE

4   OUNCES ON THIS OCCASION?

5   A.  NO.  THIS -- THAT ONE I SAID I WAS GOING TO BUY ONE FROM

6   SANTOS JUST LIKE THAT.  I THINK THAT'S WHAT IT WAS.  THAT'S

7   WHAT IT WAS.

8   Q.  YOU THINK THAT'S WHAT IT WAS?

9   A.  YES.

10  Q.  ALL RIGHT.

11          NOW, LET'S TALK ABOUT SEPTEMBER 29, 1994.  YOU

12  REMEMBER THAT'S THE DAY YOU TESTIFIED THAT YOU PURCHASED

13  SOMETHING FROM ORESTES BRUZON?

14  A.  YES, I DID.

15  Q.  NOW, IF I UNDERSTAND, IF I RECALL YOUR DIRECT TESTIMONY

16  FROM YESTERDAY ABOUT THAT INCIDENT, YOU SAID THAT YOU WERE

17  SUPPOSED TO MEET HIM AT THE RESTAURANT IN THE EARLY AFTERNOON;

18  IS THAT CORRECT?

19  A.  YES.

20  Q.  BUT YOU DIDN'T MEET HIM EARLY IN THE AFTERNOON?

21  A.  NO, I DIDN'T.

22  Q.  TELL US, IF YOU WOULD, WHAT HAPPENED.  DID YOU GO AND MEET

23  WITH THE AGENTS EARLY IN THE AFTERNOON?

24  A.  WE WERE ALL DAY LONG, WE WERE ALL DAY LONG BY TELEPHONE AND

25  BY THE CHURCH.

RUFUS L. HIXON

233

1  Q.  OKAY.

2  A.  I MEAN -- WHAT -- MY FRIEND -- NO.  WE WERE DRIVING

3  TOGETHER.  I MEAN, WE WERE IN THE SAME CAR.  HE WENT TO DELIVER

4  SOMETHING, AND I WENT IN THE CAR.

5  Q.  AND HE GOT ARRESTED AND YOU FLED?

6  A.  YES, I DID.

7  Q.  NOW, THAT CASE WAS MADE ON AUGUST 12TH, THE ARREST WAS MADE

8  ON AUGUST 12TH, 1994; IS THAT CORRECT?

9  A.  YES.

10 Q.  AND YOU STARTED WORKING WITH THE F.B.I. AND THE D.E.A.

11 SHORTLY THEREAFTER; ISN'T THAT CORRECT?

12 A.  YES.

13 Q.  AND THEY STARTED PAYING YOU MONEY AT THAT POINT; ISN'T THAT

14 CORRECT?

15 A.  YES.

16 Q.  IN FACT, I THINK YOU JUST TESTIFIED A MINUTE AGO THAT FROM

17 A PERIOD OF THAT TIME IN THE SUMMER OF '94 UNTIL, LET'S SAY,

18 EARLY PART OF '96 YOU RECEIVED ALMOST $30,000?

19 A.  YES.

20 Q.  THAT'S UP TO, SAY, FEBRUARY OF 1996; IS THAT CORRECT?

21 A.  '96?  I THINK SO.

22 Q.  HAVE YOU CONTINUED SINCE FEBRUARY OF '96 TO RECEIVE MONEY

23 FROM THE F.B.I. AND THE D.E.A. AND OTHER POLICE AGENCIES?

24 SINCE FEBRUARY OF '96 HAVE THEY CONTINUED TO PAY YOUR BILLS,

25 SIR, PAY YOU MONEY?

RUFUS L. HIXON

**#13**

U.S. Department of Justice
Drug Enforcement Administration

| 1. Program Code | | 2. Cross File | Related Files | 3. File No. | | 4. G-DEP Identifier |
|---|---|---|---|---|---|---|
| | | ☐ | | G3-94-C100 | | INC11 |
| | SA James E. Stearns | ☐ | | 6. File Title | | |
| At | Atlanta, GA | ☐ | | MARTINEZ, Angel et al | | |
| | | ☐ | | | | |
| 7. ☐ Closed ☐ Requested Action Completed | | ☐ | | 8. Date Prepared | | |
| ☐ Action Requested By: | | | | May 9, 1995 | | |

9. Other Officers: TFA Sinner, SA Sindall (FBI), SA Jack Harvey, TFA McClendon, TFA Hall, TFA Jose Diaz, TFA Manny Perez

10. Report Re:

**DETAILS:**

1. On Friday, April 7, 1995 at approximately 5:30 pm, surveillance was established in the vicinity of El CHARRO I Mexican Restaurant, 2581 Piedmont, Road, Atlanta, GA, by the above agents.

2. At approximately 5:40 pm, TFA Skinner observed SG3-94-X064, hereafter referred to as CI, parking his/her vehicle in front of El CHARRO and enter the restaurant at approximately 5:41 pm.

3. At approximately 6:00 pm, TFA Diaz and SA Stearns learned via transmitting/recording device (Exhibit N-152) that the CI was about to depart the restaurant and drive to Pancho's Restaurant on Buford Highway. The CI advised he/she was to pick up an item and return with it to El CHARRO I. The CI did this as a favor for an employee at El CHARRO I.

4. At approximately 6:12 pm, TFA Skinner observed the CI return to El CHARRO I and carry packages into the restaurant.

5. At approximately 6:21 pm, TFA Diaz heard via transmitting/recording device, the CI talking to Chino BRUZON. BRUZON's arrival at El CHARRO I was not observed. At approximately 6:22 pm, TFA Diaz again heard via transmitting/recording device the CI purchase Exhibit #13, approximately 110 grams of cocaine from BRUZON. At approximately 6:24 pm, BRUZON received a telephone call while in the office at El CHARRO I from an unidentified individual.

6. At approximately 6:30 pm, the CI departed El CHARRO I Restaurant and was met at a predesignated location by SA Stearns and TFA Diaz. The CI was searched by TFA Diaz with negative results. CI relinquished to SA Stearns Exhibit #13.

| 11. Distribution: | | 12. Signature (Agent) | 13. Date |
|---|---|---|---|
| Division | | SA James E. Stearns | 5-16-9 |
| District | | 14. Approved (Name and Title) | 15. Date |
| Other | AMRI/DIG/CE | ACS Jeffrey Dalman | 5-16- |

DEA Form - 6
(Aug. 1994)

**DEA SENSITIVE**
Drug Enforcement Administration

3 - Originating Office

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 5/80 may be used.

15

Department of Justice
Enforcement Administration

## ACQUISITION OF NON-DRUG PROPERTY AND REGULATORY SEIZURE

| 1. TYPE OF PROPERTY | | 2. FILE NO. | | 4. G. DEP. IDENTIFIER |
|---|---|---|---|---|
| ☒ EVIDENCE | ☐ MONEY ☐ REGULATORY | | | |
| ☐ FORFEITURE | ☐ Recovered ☐ FILM/FINGERPRINTS | 5. FILE TITLE | | |
| ☐ TEMPORARY CUSTODY | ☐ Seized ☒ OTHER | MARTINEZ, Abel et al | | |
| ☐ Safekeeping | 6. CUSTOMS REFERRAL | 7. DATE PREPARED | | 8. PROGRAM CODE |
| ☐ Transfer to Another Agency | ☐ Case No.    OR  ☐ Seizure No. | April 7, 1995 | | |
| | No. | | | |

| 9. Exhibit | 10. NAME AND DESCRIPTION OF ARTICLES | 11. COND. CODE | 12. VALUE |
|---|---|---|---|
| N-152 | Audio Cassette Tape | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### 13. REMARKS

On 4/7/95, Exhibit N-152, was obtained by S/A Stearns.  N-152 is a recorded conversation between SG3-94-X064 and Jesus BRUZON, aka CHIMO, while inside El Charro I Restaurant, off of Sidney Marcus Blvd., Atlanta, GA, concerning a purchase of approximately 3 oz. of cocaine.  S/A Stearns processed the Exhibit as evidence.  S/A Stearns maintained custody of the Exhibit until released to the Atlanta Field Division non drug evidence custodian.

| SUBMITTED BY SPECIAL AGENT/INVESTIGATOR (Signature) | 15. APPROVED BY (Signature & Title) |
|---|---|
| S/A James E. Stearns | G/S James Matthews |

### RECEIPT REPORT

| 16. NO. PACKAGES | 17. RECEIVED FROM (Signature & Date) | | 18. TITLE |
|---|---|---|---|
| 19. SEAL ☐ Broken ☐ Unbroken | 20. RECEIVED BY (Signature & Date) | | 21. TITLE |

### DISPOSITION (FOR EVIDENCE CUSTODIAN USE ONLY)

| 22. Date DEA-48 | 23. Exhibit | 24. Authorizing Name | 25. | Means of Disposition | 26. | Name |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

### 27. REMARKS

| 28. ANALYST (Signature) | 29. DATE | 30. APPROVED BY (Signature) | 31. DATE |
|---|---|---|---|

15

U.S. Department of Justice
Drug Enforcement Administration

| 1. Program Code | | 2. Cross File | Related Files | 3. File No. | | 4. G-DEP Identifier |
|---|---|---|---|---|---|---|
| SA James E. Stearns | | ☐ | | C3-94-C100 | | INC11 |
| At Atlanta, GA | | ☐ | | 6. File Title | | |
| | | ☐ | | MARTINEZ, Angel et al | | |
| | | ☐ | | | | |
| 7. ☐ Closed  ☐ Requested Action Completed | | ☐ | | 8. Date Prepared | | |
| ☐ Action Requested By: | | | | May 9, 1995 | | |

9. Other Officers:  TFA Skinner, SA Sindall (FBI), SA Jack Harvey, TFA McClendon, TFA Hall, TFA
Jose Diaz, TFA Manny Perez

10. Report Re:

## DETAILS:

1. On Friday, April 7, 1995 at approximately 5:30 pm, surveillance was established in the vicinity of El CHARRO I Mexican Restaurant, 2581 Piedmont, Road, Atlanta, GA, by the above agents.

2. At approximately 5:40 pm, TFA Skinner observed SC3-94-X064, hereafter referred to as CI, parking his/her vehicle in front of El CHARRO and enter the restaurant at approximately 5:41 pm.

3. At approximately 6:00 pm, TFA Diaz and SA Stearns learned via transmitting/recording device (Exhibit N-152) that the CI was about to depart the restaurant and drive to Pancho's Restaurant on Buford Highway. The CI advised he/she was to pick up an item and return with it to El CHARRO I. The CI did this as a favor for an employee at El CHARRO I.

4. At approximately 6:12 pm, TFA Skinner observed the CI return to El CHARRO I and carry packages into the restaurant.

5. At approximately 6:21 pm, TFA Diaz heard via transmitting/recording device, the CI talking to Chino BRUZON. BRUZON's arrival at El CHARRO I was not observed. At approximately 6:22 pm, TFA Diaz again heard via transmitting/recording device the CI purchase Exhibit #13, approximately 110 grams of cocaine from BRUZON. At approximately 6:24 pm, BRUZON received a telephone call while in the office at El CHARRO I from an unidentified individual.

6. At approximately 6:30 pm, the CI departed El CHARRO I Restaurant and was met at a predesignated location by SA Stearns and TFA Diaz. The CI was searched by TFA Diaz with negative results. CI relinquished to SA Stearns Exhibit #13.

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division | SA James E. Stearns | 5.16.95 |
| District | 14. Approved (Name and Title) | 15. Date |
| Other  APRI/DIG/CE | ACS Jeffrey Dalman | 5.16. |

DEA Form - 6
(Aug. 1994)

**DEA SENSITIVE**
Drug Enforcement Administration

3 - Originating Office

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 5/80 may be used.

Department of Justice
Enforcement Administration

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZ**

| 1. HOW OBTAINED (CHECK) | ☐ Purchase | X Seizure | ☐ Free Sample | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G DEP C |
|---|---|---|---|---|---|---|
| ☐ Other (Specify) | | | | | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Atlanta, Georgia, U.S. | 4-7-95 | NEPTUNE, Angel et al. |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|
| N/A | ☐ Case No. OR ☐ Seizure No. | 4-10-95 | Three |

| 9. Exhibit No. | 10. FDIN (8 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purch |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | Co |
| 13 | | Cocaine | (1) Plastic bag containing off white Rocky substance wrapped in tissue. | | 110 grams | $2550 expend |
| | | | | | | |
| | | | | | | |

WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG? ☐ NO (Included above) ☐ YES (If Yes, enter exhibit no. and describe original container fully)

**REMARKS:** On 4-7-95 SGO-94-XX044 purchased Exhibit #13 from Jesus Bruzon (aka "Chino") for $2550.00 of OAF. Exhibit #13 was then released to S/A Jim Stearns. Exhibit #13 was then transported to the Atlanta D.O. where it was deposited in the overnight Drop box for safekeeping witnessed by S/A David Panek. On 4-10-95 Exhibit #13 was retreived by S/A Jim Stearns and it was weighed, inventoried, packaged and later mailed registered mail to the SEL Miami, Fla. return receipt requested.

//////////////// Please Examine for Latent Prints ////////////////////

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| S/A Jim Stearns | G/S Leo DeFranco |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. No. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. TITLE |
|---|---|---|
| | 101 023095 118 | |

| 22. SEAL Broken/Unbroken | 23. RECEIVED BY (Signature & Date) | 24. TITLE |
|---|---|---|
| | PS 4/18/95 | E.T. 5/10/95 |

**LABORATORY ANALYSIS/COMPARISON REPORT**

25. ANALYSIS SUMMARY AND REMARKS

84947

Exhibit 13

Gross: 110.7 g
Net: 80.9 g

Note: Original wrappers removed for fingerprints.

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | WEIGHT PER UNIT ANALYZED | | | 32. TOTAL NET | 33. RESERV |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 13 | 84947 | Cocaine Hydrochloride | 79 | % | | 63.9 g | 80.0 g |
| | | | | | | | |
| | | | | | | | |

| 34. ANALYST (Signature) | 35. TITLE Forensic Chemist Raul Morales | 36. DATE COMPLETED |
|---|---|---|
| Raul Morales 5.11.95 | | 05/04/95 |

| 37. APPROVED BY | 38. TITLE | 39. LAB LOCATION |
|---|---|---|
| | | |